## THE PRISCILLA. THE PURITAN. THE CITY OF LOWELL.

(District Court, S. D. New York. April 12, 1907.)

SALVAGE—FIRE—COMPENSATION FOR SERVICE.

Four steamships of the same owner, and largely of wooden construction, were lying for the winter at piers near each other, when one took fire in the night and burned. Another, the Lowell, worth $300,000, which was lying in the same slip, with only 50 feet between them, was in imminent peril, and would probably have been destroyed if she had remained. A small tug offered its services, but they were refused, although probably adequate, and the Lowell took a line from libelant's larger tug, and was towed to a place of safety; the service requiring half an hour. The tug then went to the assistance of two smaller tugs, and together they took out the third vessel, the Puritan, worth $800,000, which was lying on the opposite side of the pier from the burning ship and was in a position of danger, as the pier was on fire, and would probably have been injured, but not destroyed. This service took about three-quarters of an hour, and at the request of those in charge of the fourth vessel the tug then stood by during the remainder of the night, but her service was not required. The tug was valued at $60,000. Neither she nor her crew were at any time in danger. *Held*, that she was entitled to a salvage award of $9,000 in case of the Lowell, and $5,000 in case of the Puritan, and also to $250 for standing by the fourth vessel at the request of her owners; three-fourths of such award to go to the owner, and one-fourth to the crew.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 43, Salvage, §§ 55–77.

Awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

In Admiralty. Suits for salvage.

On the night of March 26, 27, 1906, several of the fleet of the "Fall River Line" were lying in winter quarters in the harbor of Newport, R. I. The three steamboats here proceeded against, as also the steamboat Plymouth (of

the same line, and in winter quarters at the same place), were without motive power of their own, but had on board crews of from 14 to 20 men, and were maintaining steam in the donkey or auxiliary boilers sufficient to keep the fire-fighting apparatus in commission and to furnish enough power to warp the vessels about the wharves at which they lay. The fire equipment of these boats was extraordinarily ample, but their construction such as to render them peculiarly liable to fire damage. The vessels named are freight and passenger steamers, with very large upper works constructed mainly of wood.

On the night in question, a southerly wind of 15-20 miles per hour was blowing, and the Fall River vessels named above were lying at three parallel wharves projecting into Newport Harbor, whereof the Long Wharf was the most southerly, the General Storage Pier the central one, and Briggs' Wharf the most northerly. On the north side of the Long Wharf lay the City of Lowell, on the south side of the General Storage Pier was the Plymouth, on the north side of the General Storage Pier was the Puritan, and on the north side of Briggs' Wharf lay the Priscilla. The Plymouth and Lowell so filled up the slip between the Long Wharf and the Storage Pier that there was but 50 feet between them amidships; while the slip on the north side of the Storage Pier was so narrow, and the Puritan so large, that there was but about 50 feet between her northerly side amidships and the south side of Briggs' Wharf. The Central Storage Pier is 275 feet wide, and Briggs' Wharf something less than 100. A summary statement of the relative positions of the vessels is that the City of Lowell was about 50 feet to windward of the Plymouth, and the Puritan and Priscilla about 275 feet and 525 feet, respectively, to leeward.

On the night in question, libelant's sea-going tug C. W. Morse, with her tow of coal barges, was lying in Newport Harbor, weather bound. The Morse is a powerful vessel of nearly 1,100 i. h. p. and, having just come in from sea, had at the time of the occurrences to be stated full steam up and her entire crew on board. She was ready for instant service. There seem to have been in the harbor that night but two other tugs; the Solicitor, a comparatively small vessel (i. h. p. 175), and the United States tug Chickasaw, lying at the Torpedo Station at Goat Island, and of somewhat less power than the Solicitor. At the time of the breaking out of the fire which gives rise to this action, the Solicitor was entirely ready for service, and the Chickasaw was almost immediately manned by a volunteer crew from the Torpedo Station and repaired to the scene of disaster.

Shortly after 1 a. m. of March 27th fire was discovered on board the Plymouth, and at 1:25 a. m. it was known to be sufficiently serious to have a general alarm sounded, which summoned to the water front the entire fire department of the city of Newport, consisting of five steamers, eight hose carriages, and one chemical engine. The crews on the vessels in winter quarters promptly prepared their fire-fighting apparatus, and seem to have kept their own vessels well covered with water, while the efforts of the land fire department were principally directed to staying the destruction of property on the wharves. Almost immediately after the sounding of the fire alarm, the Plymouth was found to be beyond saving. The fire spread to leeward from her to the General Storage Pier, and, despite every effort, worked entirely across that pier, and destroyed the buildings upon it for a distance varying from 400 to 150 feet shoreward from the water end. Sparks and cinders were carried by the wind across the 150-foot slip to Briggs' Wharf, but the firemen succeeded in preventing anything from being consumed upon that wharf, except certain old fish nets. The Plymouth was abandoned to her fate at or shortly after 1:30 a. m. of March 27th, and thereafter the fire burned fiercely upon the Storage Pier for approximately two hours before it could be said to be wholly under control.

Shortly after the discovery of the fire, and before any tug came to her assistance, the Puritan cast off her mooring lines, and was carried by the southerly wind against the southerly side of Briggs' Wharf, thus removing her from the actual place of fire for an additional distance of about 50 feet. She then endeavored to warp herself out into the stream.

While the Puritan was doing this, the City of Lowell was also endeavoring by her own lines to get outside the pier head. Although to windward, she was

so near the Plymouth that she repeatedly caught on fire in her upper works. She had succeeded in hauling her stern quite beyond the water end of the Long Wharf, when the Solicitor came to her assistance, and shortly thereafter the C. W. Morse arrived on the scene. The Lowell was in charge of an employé of the claimants, who did not permit the Solicitor to haul the Lowell out, not thinking that the hawser of the Solicitor, which was first made fast to the Lowell, had a good lead. The Morse first took a line from the Lowell, which broke. She then passed her own nine-inch hawser, those in charge of the Lowell cast off or cut their lines, and she was taken away from the dangerous proximity of the Plymouth in a few minutes and anchored at a safe distance.

I think that the Solicitor's power was sufficient to handle the Lowell, which ·was much the·smallest of the four Fall River vessels enumerated; but in my opinion the Morse did the actual service of rescuing the Lowell from a situation which might soon have involved her in the fate of the Plymouth. The entire service to the City of Lowell occupied about half an hour.

The Morse next proceeded to the assistance of the Puritan, which was then lying with her northerly side against the southerly side of Briggs' Wharf and her stern projecting slightly beyond the water end of that wharf. When the Morse arrived near the Puritan, the Solicitor and the Chickasaw were pulling on one line connecting the Puritan with themselves, and hauling in a southwesterly direction.

The only substantial conflict of testimony occurs at this point. It is maintained by the claimants that the united efforts of the Chickasaw and Solicitor had got the Puritan moving, and that she would have successfully cleared the piers and been carried by force of the wind alone beyond all danger, had the Morse not appeared. The libelant asserts that the overhang of the Puritan had in some way become foul of the piling on the southerly side of Briggs' Wharf, so that she had ceased to move, and would have there remained fast, had it not been for the power of the Morse, which applied her bow to the northerly quarter of the Puritan and shoved her to windward and clear of Briggs' Wharf, thus making possible the subsequent maneuver of getting her to a safe anchorage in the stream.

The testimony is not clear as to what it was that stopped the way of the Puritan while in charge of the Chickasaw and Solicitor only; but I find it fairly established by a preponderance of evidence that her way had stopped, or at least been materially checked, before the Morse arrived. At the time of such arrival the fire was still extending across the Storage Pier, and I find it to be true that when the Morse took hold of the Puritan she was in a position where she probably would have lain until the fire was under control, after extending to a point not more than 50 feet from the Puritan's southerly side. I find, however, also that when the fire did extend to this extreme northerly point, it was much diminished in intensity, and, while I believe the Puritan would have been injured, she probably would not have been destroyed, had she remained where she was when the Morse came alongside. She was very far from being in such danger as was the Lowell, but she was in a position from which every consideration of prudence and good management demanded her instant removal, and to such removal I believe the Morse principally contributed. Considering the size and freeboard of the Puritan. I do not think that the Chickasaw and Solicitor together were able to handle her in the high wind then prevailing.

The entire service to the Puritan occupied probably about three-quarters of an hour, and the Morse then returned to the end of Briggs' Wharf prepared to render aid to the Priscilla. By this time the fire was obviously much subdued, and all danger of fire on Briggs' Wharf was past.

While going óut with the Puritan, the Morse had been requested by the principal officers of the claimants then present to return and take out the Priscilla, but when she did return the Priscilla was so clearly in no immediate danger that the request was changed to a suggestion that she stand by. This the Morse did, remaining at the end of Briggs' Wharf during the balance of the night, and keeping a small line connecting herself with the Priscilla in order that a hawser might be taken aboard the latter vessel if necessity demanded. Before morning it was obvious that the services of salving tugs were no longer

required. At no time during the night was either the Puritan or the Priscilla on fire.

The tide at the time of these occurrences was near low water, and the Morse with her deep draught was steered with some difficulty, and at one time for a minute, possibly, was actually aground; but I do not think that her efficiency was seriously diminished. Her great power enabled her to free herself from the mud when occasion demanded. The salving tugs were not in any danger themselves. The Morse certainly did not put a stream upon the fire at any time, although her hose was ready. None of her crew left her to perform any service on the vessels assisted. The entire time elapsing from the moment the Morse left her anchorage to go to the fire until she tied up near the Priscilla's stern was approximately two hours, and of that time she was actively engaged in serving either the Lowell or the Puritan, probably, an hour and a quarter.

By stipulation, it is agreed that the value of the Morse is $60,000, of the Lowell $300,000, of the Puritan $800,000, and of the Priscilla $1,000,000.

Amos Van Etten (J. Parker Kirlin, of counsel), for libelant.
Harrington Putnam, for claimant.

HOUGH, District Judge (after stating the facts). The City of Lowell was, in my opinion, rescued from imminent peril, certain serious damage, and probable destruction.

The Puritan was removed from certain danger, probable serious damage, and in the exercise of sound judgment.

The Priscilla was, at the time when the Morse was ready to serve her, in no danger at all, and was not thereafter in danger.

"In harbor cases, where tugs are abundant and on the ground in time to give needed aid, large awards are not only unnecessary, but contrary to principle." The O. C. Hanchett, 76 Fed. 1003, 22 C. C. A. 678. This applies to the case of the City of Lowell, for, although the Solicitor did not render the effective service which removed the Lowell from danger, she was in attendance and sufficient for the purpose, had the greater power of the Morse not rendered her services superfluous.

In the case of the Puritan, I regard the Solicitor and the Chickasaw as but the helpers, efficient, but in themselves insufficient, of the Morse; but the danger to the Puritan was very much less than that from which the Lowell was rescued.

Of the classic attributes of salvage as laid down in The Clifton, 3 Hagg. Adm. 120, there are to be considered in the cases of the Puritan and Lowell only the peril of the rescued property, the time occupied, and the value salved. For there were no elements of danger to salvors, or risk of salvors' life or property, or remarkable labor or skill on the part of the salvors displayed or required on the night in question. The value was very great, the time very short, and the degree of peril high in the case of the Lowell, moderate in the case of the Puritan.

It heightens the degree of peril that the salved vessels were so largely of wood, and deprives many cases involving fires in or near steel or iron vessels (of deep sea construction) of value as standards of comparison, e. g.: The Indiana (D. C.) 22 Fed. 925; The Kaiser Wilhelm der Grosse (D. C.) 106 Fed. 963. Of salvage instances known to me, the case most appropriate to that of the Lowell is the Kaaterskill (D. C.) 48 Fed. 701, though considering the circumstances, as found by

the court, the reward given seems small. Cf. The Barge No. 127 (D. C.) 113 Fed. 529. I think a fair award to the libelant for services to the Lowell is $9,000.

While the value of the Puritan was very much greater than that of the Lowell, the danger to which she was exposed was so much less that I regard $5,000 as full compensation.

Strictly speaking, I do not think that any salvage service was rendered to the Priscilla at all, but rewards in the nature of salvage have frequently been allowed in this court for "standing by on request." The River Belle (D. C., S. D. N. Y.) 153 Fed. 475; Index-Dig. of Brown, D. J., tit. "Salvage." And other instances are known to every practitioner at this bar. Whether a service of this nature confers a maritime lien is an academic question, owing to the trifling amounts involved. The Morse was, I believe, requested by duly authorized representatives of the claimant to be ready to assist the Priscilla, and she was ready to assist the Priscilla for eight or nine hours. For this service, and without expressing any opinion on the form of the action, the libelant is awarded $250.

The amounts herein awarded may be allotted in the proportion of three-fourths to the owner of the Morse and one-fourth to the master and crew in proportion to their wage. From the wage list submitted, however, I am of opinion that there is an undue discrepancy between the wages of the master of the Morse and those of her mate (Lennan). He steered the Morse during her service, and that, I think, was a delicate piece of work. Let him receive not only his wage share, but one-half as much more; the extra half to come out of the owner's proportion. Costs are allowed in each case.