NICOLAS EUSTATHIOU & CO., owner of
THE Greek Steamship MICHALAKIS,
Libellant,

v.

UNITED STATES of America, owner of
THE U.S.S. SHADWELL (LSD
15), Respondent.

No. 7751.

United States District Court
E. D. Virginia,
Norfolk Division.

Sept. 10, 1957.

Vandeventer, Black & Meredith and
Hugh S. Meredith, Norfolk, Va., for
plaintiff.

L. S. Parsons, Jr., U. S. Atty., Norfolk,
Va., Harold G. Wilson, Trial Atty., Dept.
of Justice, Washington, D. C., for re-
spondent.

WALTER E. HOFFMAN, District
Judge.

On the early morning of October 18,
1955, a few miles east of Cape Henry,

Virginia, the S. S. Michalakis, a merchant vessel owned by a citizen of Greece, was involved in a collision with the U. S.S. Shadwell (LSD 15), a naval vessel owned by the United States of America and manned by a crew of the United States Navy. Both vessels were damaged extensively and the libel filed herein by the owner of the Greek vessel seeks damages in the sum of $235,000. No cross-libel has as yet been filed for reasons that will become apparent by reason of the legal question raised in this stage of the proceedings.

The libel alleges and the answer denies "that a citizen of the United States owning a vessel which is in collision with a 'public vessel' of the Kingdom of Greece can sue the Greek Government for any damages which he might sustain as a result of said collision". It is conceded that the Shadwell is a "public vessel" within the meaning of 46 U.S.C.A. § 781 et seq., but the respondent insists that the requirements establishing conditional waiver of immunity have not been met. Congress has seen fit to waive immunity on behalf of the United States in actions instituted by citizens of foreign countries, *conditioned* that an American shipowner would have the reciprocal right under the laws of the foreign country to sue the foreign State under a substantially similar set of facts.

It follows, therefore, that the first issue for this Court to decide is whether an American citizen, as the owner of a merchant vessel, would have the right under the laws of Greece to sue in the courts of Greece the Greek Government, as owner of a Greek naval or other vessel which has collided with an American ship, where it is alleged that the Rules of the Road have been violated and both vessels have sustained damage.

The question is not free from doubt and, as the matter concerns the interpretation of Greek laws and decisions, the problem is even more complex by reason of the apparent use of certain Greek terms which in this country have a plain and unambiguous meaning. Counsel concede that no case precisely

in point has been decided by the courts of Greece. We are required, therefore, to examine the evidence, textbook authorities, and decisions of Greek courts to arrive at the appropriate conclusion.

Undoubtedly the defense of sovereign immunity may be successfully interposed in a proper case. Benedict on Admiralty, Vol. 1, pp. 484–502; Robinson on Admiralty, pp. 248–262. It has been raised and recognized in other cases involving Greek *merchant* vessels. American Tobacco Co. v. The Ioamis P. Goulandris, D.C., 40 F.Supp. 924; Irving Trust Co. v. The Maliakos, D.C., 41 F.Supp. 697; P. Dougherty v. The Tassia, D.C., 43 F.Supp. 1015. The immediate question is whether the Greek Government has consented to be sued in its courts when its naval vessel is involved in a collision with a merchant vessel owned by an American citizen and both vessels are damaged. Admittedly there is no Greek statute comparable to our 46 U.S. C.A. § 785, which provides in substance that no suit may be brought under the Public Vessels Act by a national of any foreign government unless it shall appear to the satisfaction of the court in which suit is brought that said government, under similar circumstances, allows nationals of the United States to sue in its courts.

■ It is well settled that the foreign law must be proved to the satisfaction of the court, i.e., the court must be satisfied that an American national could sue the Greek Government for damages arising under circumstances, including ownership, similar to what is the reverse of the situation presented in this case. In essence the Court is called upon to determine the answer to a hypothetical case. In Lauro v. United States, 2 Cir., 162 F.2d 32, the case was remanded for further proof of Italian law. Proof of the Norwegian law was deemed sufficient in Westfal-Larsen & Co. v. United States, D.C., 41 F.2d 550. Under the laws of the Kingdom of Netherlands the court concluded that the statutory provisions relating to collisions at sea made no distinction between the rights of

ships owned by private individuals and ships owned by the Government, or between warships and commercial vessels. N. V. Stoomvaart Mattschaippij Nederland v. United States, D.C., 18 F.Supp. 567. The right to sue in the Canadian courts was upheld in The Mary F. Anderson, D.C., 35 F.2d 400, predicated on the fact that the owner of a French vessel had instituted such a suit against the Canadian Government in the courts of Canada. Lopez v. United States, D.C., 102 F.Supp. 870, is a case in which the court held that libellant had failed to introduce evidence to the effect that a United States national could institute such an action in the courts of Cuba. Another case involving the failure to prove that an American citizen serving as a longshoreman on an Italian vessel could maintain a civil action against the Italian Government is Maiorino v. United States, D.C., 111 F.Supp. 817. In Simonowycz v. United States, D.C., 125 F.Supp. 847, 1954 A.M.C. 1567, it was held that a Polish national had failed to prove that American nationals could sue on the same basis in Poland. In each of these cases the method of attempted proof of foreign law has varied but, in each instance in which the right to sue has been sustained, the court has been "satisfied" that the requirements of 46 U.S.C.A. § 785 have been met.

▮ Extensive hearings have been conducted and numerous briefs filed. Four witnesses, three for libellant and one for respondent, have given their versions of the Greek law. Each witness differs with respect to the reasons leading to his conclusions. Such a statement illustrates the complexities of the problem. The qualifications of the witnesses are not seriously disputed, although respondent points out that two of libellant's experts on Greek law are indirectly interested in the outcome of this case, in that Karabatos is an attorney representing the Greek Consulate in New York and Savramis is an attorney occasionally

representing the libellant in Greece, while libellant suggests that respondent's expert (Zuppas) has never passed the Greek bar or practiced law in Greece. The Court attaches no particular significance to these contentions in the absence of a controlling statute or decision as their testimony has been grounded, in the main, upon certain documentary exhibits. The proper analysis of their reasoning is the factor which must control the conclusion of this Court. In proving foreign law it is not essential that the witnesses be members of the bar of the foreign country and documentary evidence alone is sufficient. Murphy v. Bankers Commercial Corporation, 111 F.Supp. 608, affirmed 2 Cir., 203 F.2d 645; Wigmore on Evidence, 3rd Ed., Vol. 2, § 564.

The laws of Greece have, from time to time, been subjected to revision and as certain testimony relates to the status of the law prior to 1946, when Greece adopted its Civil Code, it is well to review these historical changes in chronological order. Shortly following the Greek liberation from the Turks, a Royal Decree provided that the Roman Law was to serve as the basis of Greek civil law. This Decree of 1835 was expressly abrogated by the Civil Code of 1946. The Commercial Code was made effective in 1910 and, under Article 226, naval vessels were eliminated from its operation but, prior thereto, the Greek law pointed out no line of distinction between commercial and naval vessels.[1]

In 1939 Greece established by Legislative Decree No. 1774/39 a Council for the Investigation of Marine Accidents, known and hereafter referred to as SENA (Council of Maritime Accident Control). This body is vested under law with the final word as a fact-finding group in ascertaining the legal responsibility for certain maritime accidents. It is an *administrative organization* consisting of two judges, two captains of the Royal Hellenic Navy, and the Com-

---

1. Prior to 1910, the Greek State was held liable in a collision involving Greek naval vessels. The Commercial Code of 1910 evidenced an intention to change the preexisting law in adopting Article 226.

mander of the Port Guard, the latter being the equivalent of the United States Coast Guard. Irrespective of the qualifications of the members of SENA, it is *not* a court. Actions may be instituted to enforce the decrees of SENA with damages to be determined by the court, but the ultimate question of liability is determined by SENA and the binding effect of its decision is not affected by the fact that all interested parties have not appeared and been granted a full hearing; nor does the SENA law apparently require that its findings be supported by substantial evidence. Libellant herein urges that SENA would have no jurisdiction over the hypothetical case presented, whereas respondent insists that SENA would take cognizance of the matter since, in the hypothetical case, *both* the Greek naval vessel and the American merchant vessel sustained damages. If respondent is correct in its contention, it would appear that this fact alone is sufficient to justify a dismissal of the action as 46 U.S.C.A. § 785, does not specify an administrative remedy as an alternate to court action. Maiorino v. United States, supra.

As heretofore noted, the Civil Code and the Introductory Law to the Civil Code became operative in 1946 and, by its terms, the Royal Decree of 1835 and appropriate provisions of the Roman Law therein contained were repealed. The legislation of 1946 relating to the liability of the Greek State where its "agents" acted in a private or public capacity was founded, to a large extent, upon German Law. Professors Balis and Maridakis were instrumental in preparing drafts of the Civil Code and Maridakis wrote the provisions covering State liability. The "Civil Liability of the Government of the Civil Servants and of the Juristic Persons of Public Law under the Civil Code" is the title of a textbook prepared by Professor Stassinopoulos, a member of the Council of State which is the highest administrative tribunal in Greece. For brevity, any reference to this textbook will be denoted by the abbreviation "Stass."

In 1954, Greece made effective the International Rules of the Road as promulgated at the London Conference of 1948. From 1905 until 1954 Greece had in full force and effect the International Regulations for Prevention of Collisions at Sea dated February 21, 1897, relating to both naval and merchant vessels. It will be recalled that libellant here alleges certain violations of the Rules of the Road.

With this background let us examine the various laws and decisions touching upon the important question before the Court.

### The Treaty of Friendship

The Treaty of Friendship, Commerce and Navigation effective in 1954 provides in Article VI that nationals of either party shall be accorded national treatment with respect to "access" to the courts. The testimony of one or more of libellant's experts gives the impression that the Treaty created a substantive right which did not theretofore exist, but the briefs argue that the Treaty constituted merely a declaration of pre-existing rights because of the provisions of Article 126 of the Introductory Law to the Civil Code. Under Article 126 aliens are granted the same rights as Greek nationals to sue in the Greek courts. It is clear, however, that the term "access" as used in Article VI, paragraph 1, of the Treaty refers substantially to *procedural* requirements as indicated by paragraph 5 of Article XXIV defining the word "access". It falls far short of granting substantive rights to sue the Greek Government for, to hold otherwise, would suggest that the doctrine of sovereign immunity is abolished as to any country which may be a party to the Treaty. The Court concludes, therefore, that the Treaty adds nothing to the case, and Article 126 of the Introductory Law to the Civil Code is of no assistance unless we are told that the Greek Government may not invoke the doctrine of sovereign immunity in a similar action instituted by a Greek national.

Article 914 of the Civil Code and Article 105 of the Introductory Law to the Civil Code

While there is no express statute granting the right to sue for damages sustained in a maritime collision, the decisions of the Greek courts clearly establish this principle under the general laws of torts as provided in Article 914 as follows:

> "Whoever has illegally (contrary to law) caused damage to another blamefully, is liable to damages."

With this initial premise we turn to the right of an alien to resort to the courts of Greece. There can be little doubt with respect to the status of a foreign citizen under Article 4 of the Civil Code;[2] particularly is this true in reference to the right to request relief in the courts of Greece on contractual claims instituted against the Greek State,[3] or in declaratory judgment actions against the State in determining whether foreign exchange certificates are required in connection with imports.[4] Prior to 1911, it was provided under Article 2 of the Code of Civil Procedure that an action against the government would be allowed only when the complainant first applied to the immediately higher authority requesting restitution and received a negative answer, or otherwise failed to receive a decision within six weeks, but Article 2 was repealed in 1911 and this prerequisite to bringing suit against the Greek State has been removed. By the provisions of Article 17, Section 2, Greek Code of Civil Procedure [5] and Article 1 of the same Code,[6] there can be no question as to the right and power to sue the Government in an appropriate action, subject to any existing statute to the contrary.

The true force of respondent's argument rests in the provisions of Articles 104, 105 and 106 of the Introductory Law to the Civil Code. The official translations of these laws reveal the following:

### Article 104

"In respect of acts and/or omissions of the State's agents pertaining to legal relations of private law or to its private property, the State is liable as per the provisions of the Civil Code re legal entities."

### Article 105

"In respect of illegal acts and/or omissions of the State's agents in the performance of the public authority assigned to them, the State is liable for indemnity, *unless the act and/or omission was made in violation of a provision established for the sake of public interest*. The person at fault is jointly responsible with the State, without prejudice of the special provisions re Minister's responsibility."

### Article 106

"The provisions of the two previous articles apply also in connection with the responsibility of municipalities, communes or other legal entities of public law on account of acts and/or omissions of the agents in their service."

As Article 104 imposes State liability for damages caused by the acts or omissions of its agents (organs) with relation to legal obligations under private law, such liability is governed by the rules regulating liability of corporations in accordance with articles 71, 914, 922 and 1345.[7]

---

2. Article 4 is translated as follows: "The foreign citizen enjoys the same civil rights, which are enjoyed by the Greek citizen".

3. Decision 8116/1956, Athens Court of First Instance.

4. Decision No. 639/1955, The High Court of Justice, 1st Section.

5. Art. 17, sec. 2, reads:
   "The Courts of the capitol of the State have general jurisdiction over actions against the State".

6. Art. 1 provides: "All private claims with respect to rights already acquired, raised either by one or more private individuals, by a corporation, a community, the Government, or against them, is normally subject to the jurisdiction of the civil courts".

7. Article 914 covers the general law of torts. Article 71 makes a corporation liable in damages for the acts of its agents when committed in the course of their employment. Article 922 holds responsible

In Article 105 the State is generally deemed liable for the acts or omissions of its agent in the performance of public authority in all cases other than where *"the act and/or omission was made in violation of a provision established for the sake of public interest"*. The expert witnesses are in general agreement that the operation of a Greek naval vessel manned by a naval crew is in the public interest. At first blush it would appear that Article 105 exonerates the Greek State in the hypothetical case now before the Court. But the decisions and textbook writers support the view that, in order for the State to escape liability, the law so violated must *exclusively* protect the public interest, and that where the law offers protection to both public and private interests, the presumption is that a *public subjective right* has been conferred upon the individual so affected. As is said by one textbook writer (Stass., pp. 303, 304):

"At this point a specific *joinder* takes place of the statute (Article 105) which determines the conduct of the public authorities with one determinate person or with a group of persons, who, thus, draw from the law the power to receive satisfaction of that interest which is protected by that statute, and to realize its content, not only by the annulment of the public act which invaded that interest of theirs, but also by a redress of all the injurious consequences of that act. When that is the case, we say that we have a public subjective right. Examples: the claims which arise from all civil service relations; the right of a person not to be deprived of his personal liberty, not to be arrested, etc., unless by due course of law; the right of a person subject to due ob-

the party delegating to another the performance of certain duties when damages are wrongfully caused to a third person by the person so designated. Article 1345 exonerates the Government from any liability for the act or omission of the custodian of mortgages in the performance of his duties.

servance of the laws of the land, to make free use of his property; etc."

Respondent's expert on Greek law, Zuppas, concedes that, prior to the effectiveness of the Rules of the Road on January 1, 1954, if a collision had occurred between a merchant vessel owned by an American national and a Greek naval vessel, the American owner could resort to the courts of Greece for alleged damages resulting from the collision, but he insists that the Rules of the Road were adopted for the public or general interest. Assuming the correctness of this statement, it does not follow that the Rules of the Road made effective on January 1, 1954, were *exclusively* in the public interest where private rights have likewise been violated. The fallacy of this argument lies in the fact that, although unknown to respondent's expert, Greece operated under comparable Rules of the Road from 1905 to 1954.

There are decisions of Greek courts imposing liability upon the State for damages sustained in the operation of a motor vehicle owned by the State Automobile Operating Service "YEKA",[8] described in the opinion as "not an independent legal entity by itself but a State Service", although it must be said that special provisions of the Greek law relate to automobiles.

The celebrated Policeman cases present to some extent the question before the Court. As an outgrowth of a street demonstration in Athens, a policeman fired in the direction of the crowd and a citizen was killed. Suit was instituted against the Greek State and two decisions followed.[9] In discussing Article 105 it is suggested that the citizen's claim for protection of both his property and personal safety is his public individual right, granting to him a claim against the State for protection. In the

8. Decision 46/1949, The Athens Court of Appeal, 1st Section.

9. Decision 14160/1956.
   Decision 6449/1957, The Athens Court of First Instance (Submitted subsequent to last hearing in the present case)

recent decision of the Athens Court of First Instance (April 27, 1957), the Court referred to Article 105 by noting:

"Seeing that the law regulates through its rules the whole sphere of activity and relations between persons of both private and public law, the violation of any of these rules renders the act unlawful, i. e., contrary to law."

The decision concluded that only in cases where it appears that a public disturbance is beyond the control of the best organized police force, may it be successfully urged that a *force majeure* has occurred which will relieve the State of liability under Article 105.

In an earlier case [10] the State was held liable for the act of a gendarme in shooting at an automobile passing a police guardhouse without stopping. Again the Court held that the act was not being carried out in violation of a provision laid down in the public interest.

To the end that a provision of law be considered as creating a public subjective right it must meet the test of the following distinctive features: [11]

(a) It must be a binding rule.

(b) It must grant to the person the power to invoke by the law by an action (in court).

(c) It must aim preeminently at the protection of determinate private interests.

Certainly the Rules of the Road pertaining to navigation fulfill the requirements of (a) and (b) above. Do the Rules of the Road aim preeminently for the protection of private interests (interests of the private individual) and not merely for the sake of the public interest? Article 105 is substantially taken from the German law where it is said: [12]

"If the purpose, which a given service duty tends to subserve, affects only the maintenance of public order and the property interests of the entirety (of the people) or the protection of the interest of the entirety (of the people) for the normal service conduct of the employee, then the question is not of a duty imposed as against any third person(s). If, on the other hand, the duty is established in the interest of any individuals, then it is imposed upon the employee as against these individuals."

The author recognizes that, from any provision aiming at the protection of the public interest, there emanates an indirect protection of the private interests of citizens at large or of large groups of citizens. It is necessary, therefore, in searching for the purpose served by a certain law, that it be interpreted in such a manner as to disregard the letter of the law in order to ascertain its true meaning. The broad-minded approach to this problem has been accepted in Greek decisions under the theory that public agents have a duty toward all citizens to avoid, as far as possible, any invasion of their interests and to make proper use of the authorization granted to them by the statute. It is further noted that "whenever a rule of law ends in reality with the intent of satisfying private interests, it must, in doubt, be considered as vested at the same time with the purpose of subserving and protecting these interests, and that in consequence, the other distinctive features also concurring, it tends to create a public subjective right, thus taken as enacted for the protection of both public and private interests."

In our hypothetical case we are faced with a Greek naval vessel returning to port meeting an American merchant vessel outbound. While the Rules of the Road are applicable to both naval and commercial vessels, they were primarily intended to regulate navigation generally and it was not anticipated that a naval vessel, not actively engaged in wartime

10. Decision 502/1950, The Athens Court of Appeal

11. Stass., pp. 307, et seq.
12. Stass., pp. 309, 310.

activities, should be accorded any special privileges. The broad interpretation of the Greek law leads to the view that a public subjective right has been created which negatives the specific exclusionary language contained in Article 105.

The trend of the Greek decisions support this view. In one case [13] the Minister of Mercantile Marine issued an order which provided that plaintiff should provide passenger service by vessel for only the first fifteen days of each month, with service for the remaining days being furnished by another shipowner. Plaintiff, who had previously supplied daily service, instituted his action against the State. The Government invoked the provisions of Article 105, the Court holding that the prior act 499/1947 and the prior decision of the Central Harbormaster's Office granting this business to plaintiff was not intended to protect a right or interest of an individual. In more familiar language the Greek law granted to the Central Harbormaster certain police measures to regulate the movement of traffic between ports, including the right to designate more than one carrier in the interest of all citizens. No other provision of the law was allegedly violated and the Court correctly held that the State was not liable.

Three cases involving one Alfred Gibbs, a resident of London doing business in Greece, lend force to libellant's contention that an action may be maintained. In the first Gibbs case [14] suit was brought by the Greek shipowner, Epirus Shipping Company, and the underwriter, Gibbs, against the Greek Government for damages resulting from a collision between the Epirus passenger ship and a minesweeper owned by the State. The collision occurred on November 30, 1949, and Gibbs maintained his rights of subrogation as the underwriter.

The opinion indicates that the commander of the minesweeper had turned the vessel over to an officer not qualified to take command. The court held the State liable under Articles 105, 71 and 914. The second Gibbs case [15] was instituted by Gibbs alone against the State. As the commander of the vessel and the officer in charge at the time of the collision were not parties, the case turned largely on this point. The final proceeding [16] involving Gibbs determined that the two officers were jointly liable with the Greek State, but this decision was reversed [17] solely on the ground that the two naval officers were not present throughout the entire proceedings. While the Gibbs cases are not directly in point, there is a clear showing that the Greek courts did not regard the doctrine of sovereign immunity as a factor in these actions instituted by an alien.

With no effort to discuss all of the statutes, decisions and treatises on the subject, the Court concludes that, in answer to the hypothetical question, an action could be maintained under Articles 914, 105 and the Rules of the Road.

This brings us to a consideration of respondent's second important contention which is that such action, if maintainable, must first proceed through the administrative body known as SENA.

### SENA

Libellant insists that the jurisdiction of SENA is limited to vessels falling within the definition of Article 226 of the Commercial Code which expressly excludes naval vessels, and that the SENA law (Legislative Decree No. 1774/39) clearly specifies that there must be damage to a Greek "merchant vessel". Libellant concedes that, in a collision between a Greek merchant vessel and a Greek naval vessel, SENA would have jurisdiction.

13. Decision 437/1956, Areios Pagos, First Section (highest court in Greece).

14. Decision 8028/1951, Court of First Instance of Athens.

15. Decision 11016/1954, Court of First Instance of Athens.

16. Decision 18828/1955, Court of First Instance of Athens.

17. Decision 3631/1956, Court of Appeals of Athens.

It is respondent's theory that, where *both* a foreign merchant vessel and Greek naval vessel are damaged in a maritime collision, SENA would take jurisdiction.

The text writer, Antoinidis, points out that the primary aim of the SENA law is to protect insurance interests and that, where a State-owned vessel is engaged in "lucrative business", SENA should take cognizance of the matter. There is, of course, no such existing primary aim of protecting "Greek insurance interests" where a Greek naval vessel is in a collision with a foreign merchant vessel.

Libellant's three experts on Greek law have all expressed the opinion that SENA would have no jurisdiction over the hypothetical case now before the court. Respondent's expert was asked no questions concerning the applicability of SENA law. With no apparent conflict in the opinions as expressed by the expert witnesses, the Court is reluctant to speculate that SENA would take jurisdiction on the slender premise that *both* vessels sustained damage.

Under Article 1 of the Legislative Decree No. 1774/1939 (SENA Law), a marine accident is defined to be a "marine *mishap* that causes damage, destruction, or loss to a Greek *merchant* vessel, ship, or floating craft or to its cargo which may produce as a direct or indirect result a claim of the shipowner or shipper or consignee of the cargo or of any third party with respect to one another, or a *mishap* requiring the use of salvage services". The remaining portions of the Legislative Decree referred to herein make reference to the investigative powers, procedural matters, duties of SENA, etc., all of which pertain to "marine accidents" as defined in Article 1.

Antoniadis makes the following pertinent comments on SENA:

"Since law 1774 has expressly covered merchant ships, only, i. e., those carrying out commerce at sea, it ensues that ships pursuing other than lucrative aims, are excluded from its enforcement. Such are warships, including auxiliary ships of the Fleet, State ships assigned to a public service, such as pilot ships, contraband control ships, cableships, training ships, etc., ship employed for welfare and marine sports, and finally those dealing with scientific research, such as exploration, maritime observation, etc.

"The exception is reasonable and most indispensable with regard to warships and eventually to State ships, under the command of Royal Navy Officers subject to a special penal and disciplinary status.

\*　　\*　　\*　　\*　　\*　　\*

"The law provides only for Greek merchant ships. Maritime accidents occurring to foreign ships are not subject to administrative control from the Greek side.

\*　　\*　　\*　　\*　　\*　　\*

"Under the circumstances, since the law confines the enforcement of its provisions to Greek ships only, it is indisputable that maritime accidents to merchant ships flying foreign flags, even occurring in Greek waters, harbours or coastal seas, even if they carry cargo of interest to a Greek shipper or consignee, or if such cargo was damaged or lost, are not subject to the administrative control enforced by the law."

The parties generally concede that SENA is without jurisdiction where the foreign vessel *alone* is damaged. The reports of SENA clearly establish this principle.[18]

18. SENA report 13/1948—collision between a British merchant vessel and a tug operated by the Greek State.
　SENA report 45/1949—Panamanian merchant vessel cast anchor on the anchors of a tug owned by the Greek State and operated by an American company. When the tug's anchors were taken up, the anchor of the Panamanian vessel likewise came up, causing the lat-

Respondent advances the argument that SENA has accepted jurisdiction with respect to a collision between a State owned tugboat and an LCI type landing craft owned by an organization known as ODISY.[19] The landing craft was sunk while in tow of the tug. SENA fails to discuss its competency to act in the premises and, from its report, it would appear that the landing craft was *unmanned* during the tow which resulted in the sinking. Libellant suggests that SENA took jurisdiction because the State owned tug was not damaged and the landing craft, a war surplus vessel, was unmanned and owned by a State organization (ODISY) engaged in the buying and selling of Government surplus property. The question is not free from doubt and Antoniadis cites the ODISY case as an exception to the general rule.[20]

Whatever may be the reason for true that this floating equipment was SENA taking cognizance of the State landing craft case, it is undoubtedly not, at the time stated, manned by or under the control of any crew "subject to a special penal and disciplinary action", nor was the landing craft self-propelled at the time in question. If the law as expounded by Antoniadis carries any weight, it surely follows that a collision between a foreign merchant vessel and a Greek naval vessel, manned by officers of the Greek Royal Navy, would not come within the competency of SENA.

Respondent relies upon the three Gibbs cases, supra, as proof of the fact that SENA takes jurisdiction in any case involving a State owned minesweeper manned by a crew of the Royal Navy.

The difficulty with this theory is that the passenger ship was flying a Greek flag, and hence we have presented a collision between Greek merchant and naval vessels. Gibbs, a resident of England, was merely the underwriter making claim by way of subrogation. Similarly, the Papadakis case[21] concerned a barge owned by a citizen of Greece, a tug owned by Piraeus Harbour Organization, and a landing ship owned by the Greek State. The court pointed out that the barge, not being self-propelled, was neither a ship nor a small vessel within the meaning of Greek law. The Papadakis case affords no comfort to respondent in its contention that SENA would invoke jurisdiction in the hypothetical case.

■ This Court disagrees with libellant in urging that, even though SENA has jurisdiction, there is no showing that an action could not be instituted in the courts of Greece by an American national for damages sustained in a collision between an American merchant vessel and a Greek naval vessel for the alleged violation of the Rules of the Road where both vessels are damaged. As heretofore stated, SENA is not a court, and to require the exhaustion of administrative remedies before a body of experts whose decision on liability is final and controlling would effectively deprive the American national of his right to resort to court proceedings. By reason of this Court's conclusion that SENA would have no jurisdiction in the hypothetical case, it becomes unnecessary to discuss this point further.

Having concluded that the Court has jurisdiction in the premises, the parties

---

ter vessel to drift into another ship (flag unkown), resulting in slight damage to the Panamanian vessel.

SENA report 8/1948—damage inflicted by Greek water carrier to British merchant vessel.

SENA report 97/1948—collision between British destroyer and Greek floating crane resulting in damage to the destroyer.. In its report SENA stated that to be competent to act, damage must be caused "to a . Greek merchant ship and generally a floating construction, or

to her cargo, or give rise to the use of salvage facilities".

19. SENA report 173/1950.

20. Antoniadis states as to the exception: "SENA in some instances dealt with cases of maritime accidents affecting nonmerchant ships, Rep. SENA 173/1950, concerning the sinking of a State Landing Craft".

21. Decision 1059/1955—The Piraeus Court of First Instance.

will proceed to trial on the merits of the controversy with the right granted to respondent, should it be so advised, to file a cross-libel within thirty (30) days from this date. If an order is to be entered in accordance with this memorandum, it is suggested that the various briefs and appendices be made a part of the record.