NICHOLAS E. VERNICOS SHIPPING COMPANY, Limited, as Owner of THE VERNICOS MANOS and Loucas Matsas & Sons, as Owner of THE KENTAVROS, Libellants,

v.

UNITED STATES of America, Respondent.

United States District Court
S. D. New York.

Oct. 24, 1963.

Zock, Petrie, Sheneman & Reid, New York City, for libellants (John Sheneman, New York City, of counsel).

Robert M. Morgenthau, U. S. Atty. for the Southern District of New York,

New York City, for respondent (Walter L. Hopkins, Admiralty & Shipping Section, Dept. of Justice, New York City, of counsel).

MacMAHON, District Judge.

Libellants, nationals of the Kingdom of Greece, sue the United States under the Public Vessels Act (46 U.S.C. § 781 et seq.), to recover for salvage services which their tugs allegedly rendered to two ships of the United States Navy in St. George's Bay, Piraeus, Greece, on October 29 and 30, 1956.

On the evening of October 29, 1956, the U.S.S. ALTAIR and the U.S.S. MERCURY, store ships attached to the United States Sixth Fleet, were moored to the leeward side of a quay in St. George's Bay. The ALTAIR, lying perpendicular to the quay, was headed north and away from it. She was held in position by five standard lines running from her stern to the quay and two anchors projecting from her bow. The MERCURY was "Chinese moored" to the ALTAIR, viz., tied alongside, bow to stern. She was secured by six lines joining her starboard to the ALTAIR'S starboard and a single cable from her bow to the quay. This method of mooring was admittedly unsafe but was necessitated by the physical features and limited area of St. George's Bay.

Rocky shoals were located some 1,340 feet north of the ships. Another rock formation lay 375 feet to the west on the immediate port of the ALTAIR. A power plant with docks extending into the water was situated at a right angle to the quay and 375 feet to the east off MERCURY'S port. Two Greek fishing boats were directly in front of the plant, one of them tied to its dock.

At about 8:00 P.M. on October 29th, a sudden and violent squall struck in the vicinity of St. George's Bay. All the lines holding the ALTAIR and the MERCURY to the quay snapped under the strain of the storm. The interlocked ships, now held only by the ALTAIR'S anchors, were swung counterclockwise by strong southwest winds towards the power plant. This helpless rotation was quickly checked, however, by dropping the MERCURY'S anchor and heaving in on the ALTAIR'S. Nevertheless, in the interval, the ships had moved some 150 to 200 yards from their original position, missed colliding with the power plant by a scant 25 to 30 feet, and the MERCURY struck one of the Greek fishermen, breaking off its yardarm.

The ships had radioed for assistance almost at the instant the lines parted, but their call did not reach libellants' tugs until a half hour later. When the tugs, VERNICOS MANOS and KENTAVROS, arrived at 9:10 P.M., the winds had diminished, and they found the ships stationary, riding on all anchors, albeit still displaying a distress signal. The waters appear to have remained relatively calm for the tugs encountered no unusual difficulty in obtaining lines from the ships, securing them with the aid of the ships' crews, and, at the request of ALTAIR'S captain, the senior officer present, returning the ships to their original berths. The vessels were then secured to the quay as before, but with reinforced lines.

After working an hour and twenty minutes, the tugs were dismissed at 10:30 P.M. and returned to their base. Shortly afterward, however, the wind from the southwest began to pick up and by 12:30 A.M. gusts again exceeded 50 knots. The captain of the ALTAIR, concerned for the safety of his ships, recalled libellants' tugs to stand by, despite the fact that all lines were holding. The same tugs reappeared at 1:55 A.M., this time accompanied by a pilot employed by the Greek government who was transferred to the MERCURY. The winds now decreased to 12 to 14 knots with intermittent gusts of 25 to 30, and the sea was fairly calm with light swells. The tugs stood by until 3:15 A.M. when the MERCURY'S captain asked them to push against the MERCURY'S side to relieve the strain on the lines. This they did, running their engines at varying speeds, until 6:35 A.M. when they were finally discharged.

Respondent contends at the threshold that sovereign immunity deprives the court of jurisdiction over this suit. Under the Public Vessels Act (46 U.S.C. § 781 et seq.), the United States has waived sovereign immunity and consented to suits in admiralty for compensation for salvage rendered to a public vessel, but

> "No suit may be brought * * * by a national of any foreign government unless it shall appear to the satisfaction of the court * * * that said government, under similar circumstances, allows nationals of the United States to sue in its courts." 46 U.S.C. § 785.

Libellants are admittedly Greek national; their right to sue turns, therefore, on whether the Kingdom of Greece allows nationals of the United States to sue in its courts for compensation for salvage rendered to a vessel of the Royal Hellenic Navy. We hold that the Kingdom of Greece would allow such a suit by a national of the United States.

Libellants rely heavily upon the International Convention for the unification of certain rules relating to the immunity of state-owned vessels, signed in Brussels on April 10, 1926 (6 Benedict, Admiralty 236 (7th ed. 1958)). The Convention provides that:

> "Seagoing vessels owned or operated by states * * * are liable, in respect of claims relating to the operation of such ships * * * to the same rules of applicability and to the same obligations as are applicable to private vessels. * * *" (Art. 1.)
>
> " * * * damaged parties shall have the right to sue on their claims in the competent courts of the state which is the owner or operator of the vessel, and such state may not avail itself of its immunity in respect of actions * * * arising out of assistance, salvage and general average * * *." (Art. 3.)

Libellants argue that by virtue of the Greek ratification of the Convention in 1950 [Act 1600 (1950)], its provisions inure to the benefit of Greek nationals and, therefore, by operation of Greek law, to the nationals of non-signatory nations such as the United States. (The United States has neither ratified nor adhered to the Convention.) The court cannot agree with this reasoning since the Convention contains the restrictive reservation that its

> " * * * provisions * * * may be applied in each Contracting State for the benefit of non-Contracting States and their nationals only on the basis of reciprocity. * * * Furthermore, nothing shall prevent a Contracting State regulating under its own laws the rights granted to its nationals (resortissants) in its own courts." (Art. 6.)

It is clear, then, from the terms of the Convention that the citizens of signatory nations do not automatically reap its favors. Rather, their treatment is left to the discretion of the individual contracting parties. It is to be noted that the Convention does not preclude recovery by nationals of the United States since the condition of reciprocity, relative to non-signatories, found in Article 6 is satisfied by the Public Vessels Act, supra. Nevertheless, the treaty is of no help to libellants at this juncture for all it does is take us back to where we started.

The domestic law of Greece, however, as interpreted in Nicholas Eustathiou & Co. v. United States, 154 F.Supp. 515 (E.D.Va.1957), provides libellants with a potent argument. In the Eustathiou case, a United States Navy ship collided with a Greek merchant ship, and when the Greek owner brought suit, the United States raised the same defense it does here. There the court held that the defense was barred because it found that American nationals could sue the Kingdom of Greece in similar circumstances.

Like the court in Eustathiou, we labor without benefit of any Greek judicial decision, or legislative enactment, expressly allowing, or disallowing, salvage suits by Americans against the Greek govern-

ment. It is clear, however, from the court's review and analysis of Greek law in Eustathiou, with which we agree, that the Kingdom of Greece has waived the defense of sovereign immunity in other types of actions brought by both aliens and citizens. Greek law compels this conclusion for it evidences a broad waiver of sovereign immunity in Article 1 of the Greek Civil Procedure Act:

> "All private claims with respect to rights already acquired, raised either by one or more private individuals, by a corporation, a community, the Government, or against them, is normally subject to the jurisdiction of the civil courts."

This waiver is not confined to Greek nationals but is extended to United States citizens by Article 126 of the Introductory Law to the Greek Civil Code which gives aliens the same right to sue in Greek courts as Greek citizens.

Indeed, the expert on Greek law, who testified for respondents in the trial of this action, readily admitted that a United States citizen could bring any type of suit in Greece with the singular exception of salvage. He premised this lone limitation on two treaties which he viewed as barring salvage suits by United States citizens against the Greek government.

Both Greece and the United States have ratified the International Convention, signed at Brussels on September 23, 1910 (6A Benedict, Admiralty 615 (7th ed. 1958), 37 Stat. 1658 (1912)), and the terms of the Convention have been incorporated in the law of the United States (The Salvage Act, 46 U.S.C. §§ 727–731). The Convention establishes rules relating to salvage of vessels at sea and is principally concerned with the duties of masters and the size and basis of awards. Respondent calls particular attention to Article 14 of the Convention which excludes "ships of war * * * [and] Government ships appropriated exclusively to a public service" from the treaty's provisions. This clause, respondent contends, expressly prohibits suits by nationals of contracting parties for

salvage services rendered to ships owned by other signatory states. We believe that such an interpretation would give a much broader meaning to the reservation than was ever intended. It cannot seriously be argued that, because the signatories have excluded their own ships from the purview of this one treaty, they have forever contracted away their right to waive sovereign immunity by some other method, such as domestic law or other international agreement. E.g., Public Vessels Act (United States); Convention of 1926 (Greece).

In support of its contention, respondent also relies on the Treaty of Friendship, Commerce and Navigation between the United States and Greece, effective in 1954 (5 T.I.A.S. 1832). That treaty gives ships of each of the parties free access to the ports of the other and sets forth procedures governing salvage or shipwreck. Article 24, however, defines "vessels" as meaning "all types of vessels, whether privately owned or operated, or publicly owned or operated; but this term does not * * * include fishing vessels or vessels of war." Respondent would have us hold that since warships are omitted from the agreement, suits for their salvage are consequently barred. The court finds this reasoning unsound for there is nothing in the treaty which precludes either party from waiving sovereign immunity and opening their courts to aliens by other means. Thus, neither the Treaty of 1954, nor the Convention of 1910, in any way, curtails an alien's right to sue the Greek government under Article 1 of the Greek Civil Procedure Act and Article 126 of the Introductory Law to the Greek Civil Code, discussed supra.

 Respondent next contends that the services rendered by the libellants were mere towage and, as such, do not entitle them to an award for salvage.

> "A salvage service is a service which is voluntarily rendered to a vessel in need of assistance, and is designed to relieve her from distress or danger, either present or to be reasonably apprehended; and sal-

vage is the reward or compensation allowed by the maritime law for service rendered in saving maritime property, at risk or in distress, by those under no legal obligation to render it, which results in benefit to the property, if eventually saved. * * * Salvage service is to be distinguished from towage service, in that the latter is a service which is rendered for the mere purpose of expediting a vessel's voyage, without reference to any circumstances of danger, although the service in each case may be, and frequently is rendered in the same way. .* * * " The Emanuel Stavroudis, 23 F.2d 214, 216 (D.Md.1927).

We must look, therefore, not to isolated acts but to all the surrounding circumstances in judging whether the towage here constitutes salvage.

The evidence clearly demonstrates that on the evening of October 29th and the morning of October 30th, ALTAIR and MERCURY were ships in distress. The unpredictable state of the wind and weather on both occasions and the limited area for maneuver kept ALTAIR and MERCURY under the constant threat of being cast upon the rocks, the nearby ships, or shore. The boatswain of ALTAIR testified that any attempt at self-help on the 29th would have called for close maneuver, conditions being what they were, and that if conditions worsened, it would have been impossible. True, we cannot demonstrate with scientific precision that the non-occurrence of serious damage was directly attributable to libellants' efforts. Nevertheless, there is no question that the ALTAIR'S captain, appraising the situation on the spot, foresaw danger to the ships, crew and cargo entrusted to his command. The potential peril inherent in all the circumstances prompted him to summon libellants' help. Their efforts greatly reduced, if indeed they did not wholly eliminate, the exposure to disaster. Now, when flawless hindsight has resolved the uncertainties of the moment, respondent will not be heard to claim that it was neither necessary nor beneficial to use libellants' help.

■■ A much more difficult question is the amount of the award libellants ought to receive. There is no precise formula for computation. Salvage is not merely a compensatory award but a traditional bounty generously given to encourage salvors to risk their lives and property that the lives and property of others engaged in the maritime venture might be saved. There are, however, historical criteria to guide the court. In fixing the amount of an award, the court considers (1) the value of the property exposed to peril and the proportion of the value lost and saved; (2) the degree of the peril to lives and property; (3) the value of the property employed by the salvor; (4) the risk to the salvor's life and property in making the rescue; (5) the salvor's skill and dispatch in rendering the service together with the foresight and skill exercised in the preparation to render it, and (6) the time consumed and the labor performed by the salvor. The Kia Ora, 252 F. 507, 508 (4th Cir. 1918).

There is disagreement as to the value of the respondent's combined ships and cargoes. For our purposes, however, all the court need find is that their value was in excess of two million dollars and, therefore, the potential lost was great. The value of the libellants' property is placed at $142,000.

■ The skill and efficiency displayed by libellants during the time of their service is unquestioned. The promptness of their response to the call for assistance weighs heavily in their favor. Nevertheless, the court concludes that the services rendered by the libellants were not of a particularly high order of salvage. The simplicity of the operation, its short duration, the relative ease of accomplishment, and the minimal risk to both the salved and the salving vessels all indicate an instance of low order salvage. That does not, however, limit libellants to a nominal award. Burke v. United States, 96 F.Supp. 335 (S.D.N.Y.1951).

There was a tendency among the courts to seek some definite formula for assessment in salvage cases. This led, in cases of "low order" salvage, to development of the so-called "double towage" doctrine which grounds the amount on some multiple of the usual towage fee. E.g., Magnolia Petroleum Co. v. National Oil Transport Co., 286 F. 40 (5th Cir. 1923); Higgens, Inc. v. Tri State, 99 F.Supp. 694 (S.D.Fla.1951). The court rejects the doctrine as unsound for, as the Fifth Circuit observed in Mississippi Valley Barge Line Co. v. Indian Towing Co., 232 F.2d 750 (5th Cir. 1956), its adoption would create artificial inflexibility in an area where elasticity has always been the norm.

The libellants are professional salvors. They provide a necessary service for the whole maritime community, and their business should be encouraged. Profit is not only their incentive, but their life blood. Their investment is substantial and their monthly expenses amount to $4,424.78 for the VERNICOS MANOS and $3,608.12 for the KENTAVROS. We believe, therefore, that an award of three times libellants' expenses in maintaining the VERNICOS MANOS and the KENTAVROS is fair under all the circumstances. We, therefore, award $13,274.34 to the owners of the VERNICOS MANOS and $10,824.36 to the owners of the KENTAVROS.

It is the custom in salvage actions for the owners of the salving vessels to sue on behalf of their crews. Respondent contends that no such claim has been made here. Liberally construed, however, the libel does make a claim on behalf of the crew. And "[e]ven if the * * * [libellants] had not in terms sued on behalf of the crew, it is understood that the court will intervene in behalf of those wards of the admiralty." Castner, Curran & Bullitt, Inc. v. United States, 5 F.2d 214, 217 (2d Cir. 1925).

Accordingly, to the master and crew of the VERNICOS MANOS and to the master and crew of the KENTAVROS, the court awards to each man a sum equal to three times his monthly wage based on rates of pay in effect on October 29 and 30, 1956. Libellants are ordered to file a list of the names and addresses of the above-mentioned crews with the decree.

Interest on all awards shall run from the date the decree is entered.

This opinion shall constitute the court's findings of fact and conclusions of law.

Submit decree within fifteen (15) days in accordance with the foregoing.