**NICHOLAS E. VERNICOS SHIPPING COMPANY, Limited, as Owner of THE VERNICOS MANOS, and Loucas Matsas & Sons, as Owner of THE KENT-AVROS, Libelants-Appellees,**

v.

**UNITED STATES of America, Respondent-Appellant.**

**No. 423, Docket 29315.**

United States Court of Appeals Second Circuit.

Argued April 6, 1965.

Decided June 21, 1965.

Philip A. Berns, New York City (John W. Douglas, Asst. Atty. Gen., Robert M. Morgenthau, U. S. Atty., Morton S. Hollander, Chief, Appellate Section, Civil Division, Dept. of Justice, Louis E. Greco, Atty. in Charge, New York Office, Admiralty & Shipping Section, Dept. of Justice), for the United States.

John R. Sheneman, New York City (Zock, Petrie, Sheneman & Reid, New York City), Donald M. Burke, New York City, of counsel, for libelants-appellees.

Before WATERMAN, FRIENDLY and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

The United States appeals from a judgment of the District Court for the Southern District of New York, 223 F. Supp. 116 (1963), awarding the owners of two Greek tugs an amount equal to three months' expenses of maintenance, to wit, $24,098.70, and the crews an amount equal to three months' wages, to wit, $5,577.60, for salvage services to two store ships of the Sixth Fleet at Piraeus in 1956. In this court the Government wisely has not disputed, as it apparently did below, 223 F.Supp. at 119–120, that libelants in fact rendered salvage services rather than mere towage. Its points on appeal are the overruling of its defense of sovereign immunity, the making of an award to the crew, and allegedly excessive amount.

Since none of the parties quarrels with Judge MacMahon's statement of the facts, 223 F.Supp. at 117, it will suffice for the moment to say that the two naval vessels, having a value, together with stores, in excess of $2,000,000, found themselves in a condition of peril as a result of a violent squall in the early evening of October 29, 1956, while they were moored, tied to one another, at a dangerous anchorage in St. George's Bay; that libelant's tugs, which were kept in readiness to answer calls for assistance, promptly responded to radio summons; that the tugs made it possible for the ships to return to their former position; and that when the weather again worsened, the tugs returned on request and stood by throughout the night, pushing against the side of one of the vessels to relieve the strain on the lines.

■ (1) Since the salvage services were rendered to naval vessels which are not within the Suits in Admiralty Act of 1920, 46 U.S.C. §§ 741–752, the only basis for suit against the United States is the Public Vessels Act of 1925, 46 U.S.C. §§ 781–790. Section 1 of that Act, 46 U.S.C. § 781, would generally be quite adequate for the purpose but when, as here, the suit is "by a national of any foreign government," the United States has not consented to be sued "unless it shall appear to the satisfaction of the court in which suit is brought that said government, under similar circumstances, allows nationals of the United States to sue in its courts," § 5, 46 U.S.C. § 785. Libelants' right to sue thus depends on whether the United States court is satisfied that the Greek courts would entertain an action by a United States national for salvage services to a vessel of the Royal Hellenic Navy.

The conflicting expert testimony on this issue is exceedingly unsatisfactory.[1] We have found more help in Nicolas Eustathiou & Co. v. United States, 154 F. Supp. 515 (E.D.Va.1957), where Judge

---

1. Libelants' expert, who testified by deposition in Athens, had impressive qualifications; however, he based his opinion primarily on certain Greek procedural provisions and on the International Convention for the Unification of Certain Rules Relating to the Immunity of State-Owned Vessels signed at Brussels, April 10, 1926, which, as will appear below, imposes no obligation on a contracting party such as Greece to waive immunity in favor of nationals of a non-contracting party such as the United States. The United States' expert had practiced in Greece for only two years, a decade before giving his testimony; his position was that United States nationals could generally sue the Greek Government on claims relating to naval vessels but that Article 6 of the Brussels Convention prevented such a suit for salvage by nationals of a non-contracting party—a view which is arguable but which we think mistaken for reasons discussed below.

Hoffman had to decide a related issue—whether the owners of a United States merchant ship could sue in Greece for collision damage inflicted by a Greek naval vessel—and apparently received more assistance from experts than was rendered here.

Judge Hoffman answered his question in the affirmative, reasoning as follows: Article 914 of the Greek Civil Code of 1946 imposes liability on any person who has illegally caused damage to another blamefully—a provision which clearly would encompass collision damage. Article 4 of the Civil Code gives foreign citizens the same civil rights as are enjoyed by Greek citizens. Hence the owner of an American ship could sue the private owner of a Greek ship for collision damage. Whether he could sue the Greek Government would depend on Articles 104 and 105 of the Civil Code, which we quote in the margin.[2] Apparently—and, from our reading of a translation of the Stassinopoulos text, "Civil Liability of the Government of the Civil Servants and of the Juristic Persons of Public Law under the Civil Code," referred to in Judge Hoffman's opinion, 154 F.Supp. at 518, which has been made available to us by the parties, we would say rightly—he disregarded Article 104 as inapplicable to "public property" such as a naval vessel. On the other hand, suit would be permitted by Article 105 unless excluded by the italicized clause, which must have come straight from Delphi.[3] On its face this would exclude liability for collision caused by violation of the Rules of the Road. But, Judge Hoffman concluded, the words have not been given such a stultifying breadth but have been read as relating only to pro-

visions established exclusively in the public interest; apparently the aim is to allow liability for typically private claims but to exclude it when the duty is peculiarly governmental, a limitation resembling those of the Federal Tort Claims Act in 28 U.S.C. §§ 2672, 2680. See Stassinopoulos, supra, at 297. He therefore decided that the hypothetical action would lie in Greece and hence that the actual one would lie in the United States. So far as the Eustathiou opinion discloses, no contention was there made concerning the allegedly inhibiting effect of Article 6 of the Brussels Convention, see fn. 1 supra and the discussion infra, although since the Convention covers collision as well as salvage claims against naval vessels, the issue could have been raised there to the same extent as here.

■ Applying Judge Hoffman's analysis, we begin with the question whether Greek law recognizes a claim for salvage against a privately owned ship. The Government does not appear to contest this, and we scarcely need proof of the recognition of this right by the legal system of a seafaring nation, derived from the Roman law which insists on preventing unjust enrichment, see Norris, Salvage § 6 (1958). As to sovereign immunity, the claim is not barred by the language of Article 105 either as it requires an illegal act or omission or as it excludes obligations established in the "public interest." The illegal act or omission in the hypothetical case would not be the handling or location of ships so as to expose them to danger, but the failure to pay salvage for the help received. And a claim for salvage represents a typically private obligation far

2. Article 104
  "In respect of acts and/or omissions of the State's agents pertaining to legal relations of private law or to its private property, the State is liable as per the provisions of the Civil Code re legal entities."
  Article 105
  "In respect of illegal acts and/or omissions of the State's agents in the performance of the public authority as-

signed to them, the State is liable for indemnity, *unless the act and/or omission was made in violation of a provision established for the sake of public interest.* The person at fault is jointly responsible with the State, without prejudice of the special provisions re Minister's responsibility." (Italics supplied.)

3. Stassinopoulos recounts that the provision underwent several changes in the course of drafting.

removed from the peculiarly governmental duties of a public official to which the proviso of Article 105 is apparently addressed. See Stassinopoulos, supra, at 312. In the absence of more persuasive expert testimony than the Government offered, we thus incline to the view that Greece would permit American nationals to sue for salvage services to a Greek naval vessel—unless some treaty binding upon her calls for a contrary result.

The United States contends that three treaties, individually or in combination, have that effect. Two of these are manifestly irrelevant. The International Convention for the Unification of Certain Rules Relating to the Salvage of Vessels at Sea, codifying various substantive and procedural rules, signed at Brussels, September 23, 1910, to which the United States and Greece are parties, 37 Stat. 1658 (1910), provides in Article 14 that it "does not apply to ships of war or to Government ships appropriated exclusively to a public service." This simply remits claims for salvage of such ships to local law free of any obligation under this treaty. The Treaty of Friendship, Commerce and Navigation between the United States and Greece, signed on August 3, 1951, 5 U. S. T. & O. I. A. 1831–1921, contains, in Article XXII, various provisions as to refuge, salvage, wreckage, engagement of seamen etc., and Article XXIV(8) provides that a warship is not a "vessel" within

any of these provisions save one for refuge; nothing in this requires either party to recognize or not to recognize salvage claims against its naval vessels by the other party or the latter's nationals. The treaty which is relevant is one to which Greece is a party but the United States is not—the International Convention for the Unification of Certain Rules Relating to the Immunity of State-Owned Vessels, signed at Brussels, April 10, 1926, and ratified by Greece May 19, 1951. An English text can be found in 6 Benedict, Admiralty 239–42 (7 ed. Knauth, 1958).

This Convention begins, Article 1, with a broad acceptance of liability for "sea-going vessels owned or operated by states." Article 2 subjects claims against such vessels to the same procedures, including procedures *in rem,* as exist for claims against privately owned vessels. Article 3(1) first excepts warships, supply vessels and other state-owned or operated vessels employed exclusively in a governmental and non-commercial service, but goes on to permit *in personam* actions in the courts of the state which is the owner or operator for three types of claims in respect of such vessels, including claims arising out of assistance and salvage. Then Article 6 provides in relevant part: [4]

*"Extension of Provisions to Non-Contracting States — Reciprocity.*

---

4. Although we will follow this translation in Benedict, to which both parties have referred us, the Government's expert gave one more favorable to appellees:
"The provisions of the present Convention shall be applied in each contracting state but without any obligation to extend the benefit thereof to non-contracting states and their nationals and with the right in making any such extension to impose a condition of reciprocity."
On the other hand, the League of Nations Treaty Series, Vol. 176, pp. 199–215, treaty no. 4062, 1937, gives the following English version, said to be prepared by the State Department of the United States, p. 201 n. 1, which would

be more favorable to the Government's position:
"The provisions of this Convention shall be applied in each contracting State, with the reservation that its benefits may not be extended to non-contracting States and their nationals, and that its application may be conditioned on reciprocity."
We have examined the official French text, which we set forth below for the convenience of others who may be concerned:
Les dispositions de la présente convention seront appliquées dans chaque Etat contractant sous la réserve de ne pas en faire bénéficier les Etats non contractants et leurs ressortissants, ou d'en subordonner l application à la condition de réciprocité.

The provisions of the present Convention may be applied in each Contracting State for the benefit of non-Contracting States and their nationals only on the basis of reciprocity."

██ Both in this translation and in the official French text, Article 6 seems to constitute an agreement by the Greek Government not to allow a non-contracting party—here the United States—to benefit from a waiver of immunity which Greece makes in favor of contracting parties unless the United States reciprocates to Greece. That is a sensible reading; the parties to a treaty, each of whom makes a sacrifice for a countervailing benefit, do not want the other parties to extend the same benefits to a state not making such sacrifices. The question then becomes whether the condition of reciprocity is satisfied by the Public Vessels Act. The Government says it is not, because the United States has not waived immunity save to a country which has waived immunity with respect to it, the Brussels Convention forbids Greece to waive immunity in favor of the United States unless the United States has waived it as to Greece, and we thus "encounter an endless circle," since "neither Government has taken the necessary first step." We see no reason why the willingness of both governments to allow suits by nationals of the other should be frustrated by any such Gaston-Alphonse approach. If, as we have concluded, Greece is prepared to allow suits by our nationals for salvage to its naval ships save as the Brussels Convention requires it to obtain the very reciprocity that Congress has offered, the condition of § 5 of the Public Vessels Act, 46 U.S.C. § 785, is sufficiently met.

(2) The United States attacks the award to the crews as violating what it claims to be a rule of the admiralty prohibiting such awards to the employees of professional salvors; it also says that if there is to be any award, three months' wages are too much.

The law as to who may participate in a salvage award and in what proportions has suffered a sea change. "Primitive salvage law allowed nothing to the owner as such, on the ground that the award was made as an inducement to individuals to risk their lives at sea. Owners who had not personally participated in the salvage began to be allowed to share during the nineteenth century, as ship values increased * * * At first the lion's share was reserved to the crew, with the owner getting a third or a fourth. As values continued to increase the proportion was reversed; today when a salvage service is performed by anything larger than a fishing smack the owner receives more than the crew." Gilmore & Black, Admiralty (1957) § 8–11, pp. 467–68.

The Government's claim that the crews of the Vernicos Manos and the Kentavros should receive nothing is rested on the basis that since crews of professional salvors are hired for the precise purpose of rendering salvage, they lack the "voluntary" character universally held requisite for a salvage award, see Gilmore & Black, supra, § 8–4; Norris, supra, §§ 68–87; Kennedy, Civil Salvage 24–97 (4th ed., McGuffie 1958). Conceptually their position differs somewhat from that of the crew of the salvaged vessel, already in the ship's pay and inclined to save the ship in their own interest, or public employees of the Coast Guard or local fire department, acting in the line of official duty. Despite the differences in status, there is the argument that the crew of a salvage vessel have already engaged themselves to do this very work, usually at a regular salary.

Authority on the precise issue appears surprisingly scanty. In The Resolute, 168 U.S. 437, 441, 18 S.Ct. 112, 113, 42 L.Ed. 533 (1897), Mr. Justice Brown said in the course of discussing a quite different issue that "it has sometimes been held that, if such [salvage] services are rendered by seamen in the employ of a

wrecking tug, or by a municipal fire department, no lien arises, for the reason that the men are originally employed for the very purpose of rescuing property from perils of the sea or loss by fire"; no citations to the holdings were given and we note the word "sometimes." In The Cetewayo, 9 F. 717, 719 (E.D.N.Y. 1881), Judge Benedict made a salvage award to the crew of a wrecking vessel; however, he stressed that "wrecking does not necessarily include salving" and that there was no proof that the vessel had ever before earned a salvage award during the libelants' service. A square statement to the effect urged by the Government was made in The Arakan, 283 F. 861 (N.D.Cal.1922), but only as dictum supporting a liberal award to the owners on the basis that this would be all the salved vessel would have to pay. In W. E. Rippon v. United States, S.D.N.Y. 1963, Judge Croake upheld the position here taken by the United States, and the issue was not pressed on the appeal to this court, 348 F.2d 627 (1965). The many other cases cited by the Government are relevant only in that awards were there made to the owners of salving vessels without discussion of any award to the crew. By contrast, The Glengyle, [1898] P. 97, 104, aff'd, [1898] A.C. 519, confirmed an award to the "owners, masters, and crews" of two quite professional salvage vessels, again without any consideration of the issue.

Turning from the inconclusive precedents to the equities, we likewise find a number of imponderables. Whether the crew of a professional salvor has been paid compensation by its employer covering the risks of salvage will depend upon the particular facts, for fixed wages may be less in the expectation that the crew will receive salvage awards or more on the assumption that only the employer collects and collects somewhat more to offset his increased wage costs. One might guess that the greater the proportion of salvage work carried on by the ship, the more likely it is that the

risk element has been absorbed by the employer and the crew more fully compensated through wages for salvage dangers—but local custom may be to the contrary. Also, to the degree that the employer is a professional salvor, it may be thought that the actual danger to the crew is attenuated, and the need for special inducement from any source is reduced, by the experience and specialized equipment of the employer himself.

Vernicos testified that although the activity of his company (and apparently also of the owner of the Kentavros) was "mainly salvage business," the tugs engaged in the collateral activity of "deep sea towage and harbor towage, this because otherwise it is impossible to maintain a salvaging station in Greece owing to the limited number of cases which we have in our area." There is no evidence that the wages of the crews of the two tugs were more than those paid to tug crews at Piraeus generally—indeed Vernicos testified they were lower than those paid to the crews of port tugs. However, he also stated he paid no bonus to the crews for salvage operations "because they are professional salvage crews." The willingness of the crews to work for standard tug wages or less may or may not reflect a hope of awards from salved vessels even though their employer would not pay them a bonus out of his award; the record is silent on Greek practice on this score.

We are not convinced that, even in the case of crews engaged in nothing but professional salvage, the law has hardened to the degree the Government argues. Although the considerations urged by the Government weigh against the crew's claims, circumstances may arise in which the conscience of the admiralty may be moved in favor of making a modest award. Doing this would heighten the incentive of such crews—although, of course, it would also serve that purpose in the case of the ship's

own crew or of public employees to whom it is clear that no award may be made save for exceptions not here relevant. Circumstances that were appealing in the instant case were the high value of the salved vessels, the crews' receipt of wages corresponding to those on port tugs, and the existence of some peril; if the weather had worsened and the naval vessels could not be held, the tugs could have been forced between them and the power plant, which was only 375 feet east of the initial mooring and even nearer to the vessels when the tugs first appeared. See 223 F.Supp. at 117.

■ On the other hand, the award of three months' wages was excessive. The very factors which the judge considered to support a similar basis for calculating the award to the owners—payment for stand-by service and the speculative nature of salvage operations—make it inappropriate for the crews, who received their agreed wages whether or not opportunity for salvage occurred and regardless of the results. Award of the equivalent of a month's wages for less than a day's work would be most liberal.

(3) In fixing the award to the owners the judge took account of the large value of the salved vessels; of the peril to which they were still exposed even though the most extreme hazard had abated before the tugs arrived; of the value of the tugs, $142,000; of the promptness of their response and the skill and efficiency displayed; of such hazards as they underwent; and of the relatively short time consumed. Finding that the case represented a "low order" of salvage, he nevertheless thought a liberal award was merited because of the owners' character as professional salvors —theirs being the only salvage tugs in Greece according to Vernicos' testimony. To arrive at a measure he took three months' expenses, with resulting awards of $13,274.34 for the Vernicos Manos and of $10,824.36 for the Kentavros.

■ There is no force either in the Government's claim that this in part duplicated the awards to the crews or in libelants' argument that if we eliminate or reduce the latter, we should correspondingly increase the owners' awards or permit the district court to do so. Although crew wages were an item in both calculations, the theory was entirely different—in the one case, a method for calculating a bonus; in the other a basis for determining the compensation properly payable for the owner's stand-by costs and the aleatory nature of his business. Whether the award nevertheless was not excessive is another matter. The Government argues that libelants are less deserving because the tugs were not reserved exclusively for salvage work; but there is nothing to show that, despite these other assignments, the libelants did not maintain on station at Piraeus a number of tugs adequate to meet the reasonable needs of shipping in that harbor. The record contains no evidence how often the libelants' vessels were able to earn salvage or in what amounts. In view of the traditional principle of liberality in awards to professional salvors, The Lamington, 86 F. 675 (2 Cir. 1898); The Glengyle, supra, a substantial award was warranted. However, for reasons similar to those recently expounded by our brother Moore in W. E. Rippon & Son v. United States, supra, 348 F.2d 627, we think the award was overly generous, and direct that it be reduced to the equivalent of two months' expenses for each vessel.

The decree is modified by reducing the awards to the shipowners to two months' expenses and the awards to the crews to the equivalent of one month's wages and is affirmed as so modified.