Andreas SOBONIS et al., Plaintiffs,

v.

**STEAM TANKER NATIONAL DEFEND-ER, her engines, tackle, boilers and appurtenances, etc., In Rem, and National Transport Corporation, et al., Defendants.**

Andreas SOBONIS et al., Plaintiffs,

v.

**GRANEKSPORT PREDUZECE ZA IZVOZ I UVOZ ZITARICA,**
Defendants.
**Nos. 63 AD 1269, 64 AD 300.**

United States District Court
S. D. New York.
April 18, 1969.

Lebovici & Safir, New York City, for plaintiffs, by Herbert Lebovici, New York City, of counsel.

Poles, Tublin, Patestides & Stratakis, New York City, for defendants, by John

G. Poles, and Christ Stratakis, New York City, of counsel.

## OPINION

POLLACK, District Judge.

Plaintiff seamen seek a salvage award against the S/T NATIONAL DEFENDER, in rem, and against the owner and operator of the vessel, in personam. Plaintiffs also seek a salvage award against the owner of the cargo and the suits have been consolidated. Jurisdiction rests in admiralty. A full trial on the merits has been had to the Court.

In June, 1963, plaintiffs, Greek seamen, were members of the crew of the S/S MESOLOGI, a Greek flagship owned by Hellenic Shipping and Industries Company, Limited, S. A., a Panamanian corporation. The S/T NATIONAL DEFENDER is an American flagship owned by defendant National Transport Corporation, a Delaware corporation, and operated by defendant National Shipping and Trading Corporation, a New York corporation. DEFENDER's cargo, 48,500 long tons of winter wheat, was owned by defendant Graneksport Preduzece Za Izvoz I Uvoz Zitarica, a Yugoslavian corporation.

The facts are as follows:

In the latter part of May, 1963, the S/T NATIONAL DEFENDER took on board a cargo of wheat at New Orleans, Louisiana. The grain had been purchased by the government of Yugoslavia through its agent, Graneksport, under U. S. Public Law 480 and was to be delivered at either Split-Sibenik or Rijeka, Yugoslavia.

On the morning of June 3, 1963, the DEFENDER arrived at Freeport, Bahamas for bunkering. At about noon, the vessel weighed anchor and shortly thereafter dropped off the pilot. At 12:30 P. M., the DEFENDER went hard aground on a reef one mile off Grand Bahama Island with 80% of her bottom resting on a flat limestone ledge. All efforts by the vessel to free herself were to no avail. These included working her engines, transferring ballast, discharging ballast and discharging fuel.

After being advised by the master of the DEFENDER and by marine surveyors who were brought in, the ship's owner and operator decided that the vessel could not be refloated unless part of her cargo was removed. The president of the vessel's owner (who was also president of the vessel's operator) testified that his opinion at the time was that:

[the] ship cannot be dragged off the strand and that she would, in all probability, have to be lightened. We would have to take cargo off the ship in order to get her—it would be too risky, far too risky, to try to pull her off, even if that were possible, and I thought that it would be just totally impossible for any tugboat to pull her off. This appeared to be quite obvious shortly after the ship grounded, and after we had the information from the master.

In the days following, defendants received and refused a number of offers from professional salvage organizations to refloat the DEFENDER on a "no cure, no pay" basis. Instead, they canvassed the market for a ship available for immediate charter and capable of receiving enough cargo from the DEFENDER to lighten the stranded vessel the requisite amount.

On June 6, 1963, the vessel's owner, defendant National Transport, concluded a charter party with Hellenic Shipping for the hire of the latter's ship, the S/S MESOLOGI, "for a minimum period of thirty days or for a voyage to Yugoslavia, at charterers' option." The contract stipulated that the MESOLOGI was "to be employed in the lighterage of grain cargo from the American S/T NATIONAL DEFENDER now laying aground off Freeport, Bahama, and after her refloating either reload said cargo back unto the S/T NATIONAL DEFENDER or proceed to such port or ports in Yugoslavia as the Charterers or their Agents shall direct * * *." The charter hire and other expenses stipulat-

ed for in this contract have been paid by the owner of the DEFENDER to the owner of the MESOLOGI.

The MESOLOGI left New York on June 6, with the plaintiff crewmen on board, and proceeded directly to the Bahamas. During the six day voyage, the crew cleaned the MESOLOGI's holds and prepared for the receipt of the grain by constructing feeder boxes and shifting boards.

On June 12, 1963, the MESOLOGI came alongside the DEFENDER and the transfer of the grain commenced. The work was accomplished by means of small diesel engines known as vacuvators or grainveyors which sucked the grain out of the holds of the DEFENDER and blew it into the holds of the MESOLOGI through flexible metal piping. All of this equipment belonged to the DEFENDER; it was carried on board and was the ordinary means of loading and unloading her cargo.

There was considerable dispute at trial as to the services of the members of the MESOLOGI crew in relation to the transfer and storing of the grain. The testimony thereof given by the then chief mate of the MESOLOGI, who is also a plaintiff herein, was disputed by a representative of defendant National Shipping and Trading who was on the scene. The latter attributed the burden of the work, particularly the disagreeable part of it, to a crew of Bahamian shore laborers which was hired to do the work aboard the MESOLOGI.

Except as mentioned below, no member of the crew of the MESOLOGI worked on board the DEFENDER in transferring the cargo off that ship. This part of the operation was performed entirely by the DEFENDER's crew with some help from the Bahamian laborers, except for two engineers and an apprentice from the MESOLOGI who helped to tend some of the vacuvators aboard the DEFENDER. The heavy labor of trimming the cargo inside the holds of the MESOLOGI was substantially all performed by the Bahamian laborers. The deck crew of the MESOLO-

GI and some others assisted in the receipt of the cargo aboard their vessel by connecting the pipes and directing the grain flow from them into the proper holds and by doing part of the trimming. The work of the crew and of the shore laborers was performed around the clock and—at least down in the holds —under unpleasant conditions due to the dust from the wheat as it fell from the pipes. The weather throughout the operation was clear and fair; the sea, with one exception discussed below, was calm.

On June 18, after having received between 11,000 and 12,000 long tons of the wheat, the MESOLOGI cast off from the DEFENDER and proceeded to anchorage some distance away. The DEFENDER then discharged about 5,000 tons of ballast that had been used to keep the ship steady on the reef during the transfer operation and, with the help of a tug and of the high tide, floated free of the reef at about 5:00 P. M.

Both vessels returned to Freeport for bunkering and then proceeded to Yugoslavia without further incident and delivered their respective portions of the wheat in late July. On July 29, 1963, the MESOLOGI arrived at Pylos, Greece where the entire crew was discharged and paid by Hellenic Shipping, their employer, receiving in addition to their regular wages various overtime and special payments for the extra and non-routine work they performed during the voyage.

On September 13, 1963, the plaintiffs herein, who comprise the entire crew of the MESOLOGI during the relevant period, filed this suit in the United States District Court for the Eastern District of Virginia. Three months later the case was transferred to the Southern District of New York. Neither the master of the MESOLOGI nor her owner, Hellenic Shipping, has joined the suit; nor have they made any claim for salvage against the DEFENDER. On August 14, 1968, the defendants made an offer of judgment in the sum of $3,710.-00, which represented the total basic

wages of all the plaintiffs for one month as of June, 1963. This was rejected and the case proceeded in due course to trial.

Defendants have raised a number of defenses to the claim of salvage and these will be discussed in turn.

Defendants have insisted that the case is governed by the law of Greece, the law of the vessel's flag, and that under Greek law the plaintiffs neither have standing to bring the action nor substantive merit to their claim. The defendants supported these contentions with the testimony of a leading Greek admiralty lawyer who testified extensively on Greek salvage and admiralty law but claimed unfamiliarity with the law administered by American admiralty courts.

It is settled beyond all question that a claim for salvage in an American court arises out of the *jus gentium* and does not depend on the local laws of particular countries. S/S Belgenland v. Jensen, 114 U.S. 355, 5 S. Ct. 860, 29 L.Ed. 152 (1885); Barkas v. Cia. Naviera Coronado, S. A., 126 F. Supp. 532 (S.D.N.Y.1954); Dalmas v. Stathatos, 84 F.Supp. 828 (S.D.N.Y. 1949); Chapman v. The Engines of The Greenpoint, 38 F. 671 (S.D.N.Y.1889); Anderson v. The Edam, 13 F. 135 (E.D. N.Y.1882); The Bee, 3 Fed.Cas.No.1,-219 (D.Me.1836). The applicable law is "the general maritime law, as understood and administered in the courts of the country in which the litigation is prosecuted." S/S Belgenland v. Jensen, *supra*, at p. 369, 5 S.Ct. at p. 867. Plaintiffs' standing to sue is not affected by the absence from the suit of the owner of their vessel or the master. Waterman Steamship Corp. v. Dean, 171 F.2d 408 (4th Cir.1948); The Morzhovoi, 20 F.2d 265 (W.D.Wash.1927).

Defendants have directed the Court's attention to Usatorre v. The Victoria, 172 F.2d 434 (2d Cir.1949), and to The Superior, 270 F. 283 (E.D.N.Y. 1920), for the proposition that the crew's right to claim salvage is a matter of the internal economy of their own ship and is governed by the law of their ship's flag. In each of the cases cited, however, the crew was claiming salvage *against their own ship*. Such a claim is not generally allowed under general maritime law since a salvage must be voluntary and the crew is obligated to do everything it can for the safety of their own ship. The exception is when there has been a complete abandonment of the ship and a crew member then goes back voluntarily and saves the ship. In both *The Victoria* and *The Superior*, the issue was whether or not there had been such an abandonment as to make a crew member who did return a volunteer. In such circumstances, the courts looked to the law of the vessel's flag to determine the extent of the obligation that the crewman owed *to his own ship*. See generally Norris, The Law of Salvage, §§ 69–76 (1958).

The parties have agreed that the existence of a peril is a prerequisite to a salvage award; but the nature of the peril required by law and the existence of the peril in fact have been disputed. The defendants have presented substantial evidence that the DEFENDER was not *in fact* in any significant danger, either immediate or apprehended. Such was the opinion of the vessel's captain, of the marine surveyor from the Salvage Association of London brought in by the vessel's insurance underwriters, and of the naval architect and engineer who had supervised the construction of the vessel. Defendants also introduced the testimony of an expert marine meteorologist who testified that the wind and seas off Grand Bahama Island could be expected to be essentially calm for 95% of the month of June, that there have been only four hurricanes since 1900 in the month of June anywhere in the area, and that the likelihood of a hurricane in the Bahamas on any given day in June is no more than one-tenth of one per cent. This expert also examined the official United States Weather Bureau maps for June of 1963 and concluded that the actual weather forecast upon which the defendants would have relied

during the time that the DEFENDER was stranded called for calm seas and clear weather.

Plaintiffs introduced testimony that on the first day of the cargo transfer operation there was a strong breeze and small swells which caused the MESOLOGI to roll and to surge or pound against the much larger NATIONAL DEFENDER. It is undisputed that this caused some damage to the superstructures of the two vessels, evidently because the momentum created by even small swells is enough to cause damage to vessels of that size whenever there is contact. The transfer of the grain was temporarily suspended while better fendering equipment was brought out from Freeport. The MESOLOGI was placed on the landward side of the DEFENDER and during the remainder of the transfer operation the seas proved to be calm. The damage did not endanger the overall safety of the DEFENDER nor was there any evidence that the pounding together of the two ships endangered the crew of either ship.

██ The Court finds that as matter of fact the S/T NATIONAL DEFENDER was in no immediate or reasonably apprehended danger of destruction while it lay on the reef off Grand Bahama Island; but such is not the only measure of the peril necessary to support an award of salvage. Judge Augustus Hand has said that "when a vessel is stranded, she and her cargo are practically always in a substantial peril. Such a vessel is helpless because she cannot pursue her intended voyage or deal effectively with any emergency which may arise." Navigazione Generale Italiana v. Spencer Kellogg & Sons, Inc., 92 F.2d 41, at 44 (2d Cir.), *cert. den.* 302 U.S. 751, 58 S.Ct. 271, 82 L.Ed. 580 (1937). And the parallel he drew between the peril necessary to support a general average contribution and that necessary to support a salvage award is particularly pertinent to the instant case since it is undisputed that defendant National Transport, owner of the DEFENDER, demanded and received a general average contribution from defendant Graneksport, owner of the cargo, to help cover the costs arising out of the stranding.

██ While every stranding may not give rise to a substantial peril in the factual sense, it is nonetheless undeniably true that a stranded ship which cannot refloat itself unaided is earning no money for its owner, is performing no function for which it was built, and is deteriorating generally in monetary worth, in usefulness, and in reputation. The cases are clear—and the Court so holds—that such a situation as matter of law is peril enough to support an award of salvage. The Saint Paul, 86 F. 340, at 343 (2d Cir.1898); The Naiwa, 3 F.2d 381 (4th Cir.1924); The Leonie O. Louise, 4 F.2d 699 (5th Cir.1925); *cf.*, The Saragossa, 21 Fed.Cas.No.12,-334 (S.D.N.Y.1867); The James T. Abbott, 13 Fed.Cas.No. 7,202 (D.Mass. 1864).

The next question is whether or not the particular services rendered by the plaintiffs herein to the NATIONAL DEFENDER were in the nature of salvage. Defendants have directed the Court's attention to Judge Hutcheson's treatment of a not too dissimilar situation in Bond v. A. H. Bull S.S. Co., 13 F.2d 893 (S.D.Tex.1926). There, crewmen were denied an award in salvage because they had contributed no *personal* services in rescuing the vessel in distress but had merely performed their routine tasks aboard their own ship which had gone to the aid of the other vessel pursuant to a written contract for towage that expressly stipulated against any salvage claims.

██ While the analysis in the *Bond* case is not lacking in logic, the ambit of services included within the concept of salvage is probably broader than the one indicated by the case. Salvage awards are not limited to individual acts of great daring and intrepidity aboard a vessel on the very verge of calamity. The law of salvage recognizes as worthy of an award any act by a ship and its

crew—whether individually or as a unit —which is of assistance to a vessel in distress and which at least in part contributes to the ultimate rescue of that vessel. The aim of the law is to encourage the immediate offer of assistance when the danger first arises, even though the assistance rendered be nothing more than mundane, and thus to avoid the necessity for breathtaking heroics at a later stage when the chances of success are much diminished. It is success and not heroics which is the *sine qua non* to an award of salvage.

Thus salvage awards have been granted to a ship and *all* of its crew for merely bringing the news of a vessel in distress and its location to the eventual salvors. The New Orleans, 23 F. 909 (E. D.La.1885); The Cachemire, 38 F. 518, 522 (D.S.C.1889); *cf.* The Flottbek, 118 F. 954, 959–960 (9th Cir.1902). Similarly, merely standing by ready to give assistance to the vessel in distress, although no assistance is ultimately required, has been held to warrant an award in the nature of salvage to a ship and *all* of its crew. The Priscilla, 153 F. 476, 480 (S.D.N.Y.1907); The Apache, 124 F. 905, 913 (E.D.S.C.1903); The River Belle, 153 F. 475 (S.D.N.Y. 1893).

Therefore, the fact that the crewmen of the MESOLOGI were called upon for no more than their routine tasks aboard their own ship will not prevent an award to them if they, together with their ship, contributed to the refloating of the DEFENDER and the saving of its cargo. And, indeed, even if personal services were necessary, it is undisputed that three MESOLOGI crewmen, as has been mentioned above, actually worked on board the DEFENDER tending some of the vacuvators during the entire operation.

■ Voluntariness of the services rendered is a further prerequisite to a salvage award. Defendants have stressed that the plaintiffs performed their tasks under the orders of their master and these were within the ordinary scope of their employment under their shipping articles and Greek law. This does not deprive the services herein of a voluntary character, that is, services rendered without a pre-existing obligation to perform the same.

■ The general rule as to voluntariness was succinctly stated by Pickford, L. J., in The Sarpen, [1916] P. 306, 315:

> The test of voluntariness is only applicable as between the salvor and salved, and if the services be voluntary in relation to the salved, i. e., not rendered by reason of any obligation towards him, it is quite immaterial that the salvor has been ordered by someone who has control of his movements to render them.

It cannot be disputed that when the DEFENDER went aground on June 3, 1963 the members of the crew of the MESOLOGI owed no duty, contractual or otherwise, to the stranded vessel. That agreements were entered into thereafter does not affect their status as volunteers. Kennedy's Civil Salvage, p. 30 (4th ed. 1958).

It is undisputed that on June 6, 1963 the owner of the NATIONAL DEFENDER and the owner of the MESOLOGI entered into a standard form charter party under which the MESOLOGI was to receive a part of the cargo from the DEFENDER and then was either to reload it aboard the DEFENDER after the refloating or carry it to Yugoslavia, at the DEFENDER's option. This employment was for a fixed compensation that did not depend upon success and the compensation thereunder has been paid. Defendants argue that this contract, by itself, operates as a bar to the plaintiffs' claim for salvage, since they were aware of the contract in advance of the voyage and performed services thereafter in the ordinary scope of their employment.

■ The general rule in this regard is clear: an agreement between the owners of the salved and salving vessels, binding though it may be between them, cannot by itself affect the independent

right of the salving crew to claim an award from the vessel they have rescued. The Neptune, 277 F. 230, 232 (2d Cir. 1921); Bergher v. General Petroleum Co., 242 F. 967, 970 (N.D.Cal.1917); The Lowther Castle, 195 F. 604, 608 (D.N.J.1912). Cases cited by defendants in this regard are inapposite since they merely hold that agreements made between the *owners* of the vessels are enforceable *inter se* and do not reach the question of the effect of such an agreement upon the salving crew. The Elfrida, 172 U.S. 186, 19 S.Ct. 146, 43 L.Ed. 413 (1898); The Kennebec, 231 F. 423 (5th Cir.1916); Elphicke v. White Line Towing Co., 106 F. 945 (8th Cir.1901).

But defendants argue that the salving crew may assent to the terms of the contract between the owners in advance of the voyage and thereby waive their independent right to a salvage award as long as their duties under the contract are routine and the risks to which they are exposed are not out of the ordinary. McKnight v. New Orleans Coal & Bisso Towboat Co., 39 F.2d 457 (5th Cir. 1930); Squires v. The Ionian Leader, 100 F.Supp. 829 (D.N.J.1951); Norris, The Law of Salvage, § 176, at p. 286 (1958), *cf.*, Bond v. A. H. Bull S.S. Co., *supra*.

 Even assuming that those cases express a general legal principle to be followed (and this is not at all clear) the evidence adduced at trial did not convince the Court that plaintiffs had any substantial knowledge of or had acquiesced for themselves to the terms of the charter party on June 6, 1963 when the MESOLOGI departed from New York. The testimony indicated that, at most, the crew were made aware that they were going to the aid of a ship stranded in the Bahamas. There was no testimony that the subject of salvage was ever specifically raised by or with the MESOLOGI crew. No crew member was told "that if anyone wanted to make a claim for salvage to get off the boat." McKnight v. New Orleans Coal & Bisso Towboat Co., *supra*, at p. 458.

If the specific terms of the charter party were unknown to the crew and if the subject of a possible salvage claim was never raised, it can hardly be said that the plaintiffs adopted the owners' agreement for themselves. The owner of the MESOLOGI was provided with compensation for the ship at standard time charter rates; no compensation for the crew was provided. See Bergher v. General Petroleum Co., *supra*, at p. 971; Squires v. The Ionian Leader, *supra*, at p. 835.

Defendants have alleged that on June 12, 1963, just as the cargo transfer operations were getting under way, an oral agreement was made between the operations manager of defendant National Shipping and Trading and the crew of the MESOLOGI for special compensation to be paid by the defendants to the MESOLOGI crewmen who participated in the cargo transfer operations; the compensation was to be in a reasonable amount and to be fixed by defendant's representative at the conclusion of the job. The defendant's manager met with the MESOLOGI crew who were inquiring of their captain concerning "what they were going to get as payment." His testimony was:

I told the crew that the vessel, the MESOLOGI, was time chartered to load grain out of the NATIONAL DEFENDER and I asked them whether they are willing to work, so they said they are willing to work but they wanted to know how much they are going to get paid. So I told them that I have in mind to pay them from two weeks salary to a month's depending on the hours they were going to put in. They said that it was okay with them and that they left it up to my conscience and they left to their jobs.

This arrangement is supported in large part by the testimony of the master and chief mate of the MESOLOGI and conflicts with defendants' theory that the MESOLOGI crew were merely performing routine tasks within the scope of their employment. The offer of

payment clearly had nothing to do with plaintiffs' regular salary or overtime since that was the obligation of Hellenic Shipping, the MESOLOGI's owner, on which payment was received when the plaintiffs were discharged at Pylos, Greece at the end of the voyage.

After the grain was transferred to the MESOLOGI the defendant's manager was again called to the MESOLOGI at the request of the crew and he reports that:

> They asked me how much I was going to pay them, so I say, "Well, I decide to pay you one month's extra salary." From the expression on their faces I realized that they were not satisfied and they said so, but I told the captain that this is it and I left the ship.

He also testified that "not everybody" was to be paid:

> I gave a free hand to the captain to pay whoever participated in the job originally.

Plaintiffs contend that any such oral agreement cannot affect their present claim for an award of salvage since such an agreement is unenforceable in an American court under 46 U.S.C. § 600 which provides in pertinent part that:

> [E]very stipulation by which any master or seaman consents * * * to abandon any right which he may have or obtain in the nature of salvage, shall be wholly inoperative.

However, this oral agreement was made by Greek seamen on a Greek ship in either British or international waters with the place of performance similarly beyond the territorial limits of the United States; and it is at best doubtful that Congress could have intended to extend the reach of the statute quite so far. See, The Countess of Dufferin, 6 Fed.Cas.No.3,280 (E.D.N.Y.1878), so applying the predecessor statute, Rev.Stat. § 4535 (1875). And compare the analysis of Judge Learned Hand in O'Neill v. Cunard White Star, Ltd., 160 F.2d 446 (2d Cir.1947), at p. 448.

■ The Court has scrutinized all the facts and circumstances in the case and has concluded that plaintiffs are entitled either to an award of salvage or are at least equitably entitled to the benefit of the offer of defendant's representative on June 12 and 18, 1963 for the reasonable value of their services. The necessity for a choice between the two theories of recovery has been obviated by the fact that the amount of the award, whether measured by either standard, is roughly the same under the facts and circumstances of this case.

■ The amount of a salvage award is a matter of judicial discretion, depending on the circumstances of each case. "Adequate yardsticks are peculiarly lacking in determining salvage. In search of a formula for doing equity and at the same time not departing from the law's predisposition to be controlled by precedent, the result reached by that most famous Biblical judge, Solomon, may well supply the guide." W. E. Rippon & Son v. United States, 348 F.2d 627, 630 (2 Cir.1965). The following historical guidelines laid down by the Supreme Court in The Blackwall, 77 U. S. 1, 14, 19 L.Ed. 870 (1870), nonetheless have continuing vitality, W. E. Rippon & Son v. United States, *supra,* at pp. 628–629:

(1) The labor expended by the salvors in rendering the salvage service.

(2) The promptitude, skill and energy displayed in rendering the service and saving the property.

(3) The value of the property employed by the salvors in rendering the service and the danger to which such property was exposed.

(4) The risk incurred by the salvors in securing the property from the impending peril.

(5) The value of the property saved.

(6) The degree of danger from which the property was rescued.

■ The evidence demonstrates that the services rendered by plaintiffs were of the lowest grade or order of salvage. This fact alone, of course, does not compel a nominal award, Nicholas E. Verni-

cos Shipping Co. v. United States, 223 F.Supp. 116 (S.D.N.Y.1963); Burke v. United States, 96 F.Supp. 335 (S.D.N.Y. 1951); and the Court has accordingly applied the guidelines listed above in determining the actual merit and worth of plaintiffs' claim.

Plaintiffs performed only routine tasks during the salvage operation; the bulk of the heavy labor in the holds of the MESOLOGI was performed by the Bahamian shore laborers. In addition, there was credible evidence that the effort expended by some of the plaintiffs was less than wholehearted and that the tasks were considerably lightened by the availability to the MESOLOGI crew and their use of the DEFENDER's swimming pool and dining facilities.

The value of the S/T NATIONAL DEFENDER after refloating was approximately $12,000,000; the value of that portion of the cargo transferred to and delivered by the MESOLOGI was approximately $727,000; and the value of the S/S MESOLOGI was approximately $375,000. While these values are substantial, they have less relevance in the instant case than in others that have been brought to the Court's attention because neither the owner nor the master of the MESOLOGI are parties to the suit. Normally, they would be entitled to a very large share of any salvage award in circumstances such as these because the ship itself, as receptacle, was the major factor in the success of the operation and because what little risk, if any, there was during the operation, was to the ship, not to the crew. Moreover, the DEFENDER was in no immediate or apprehended danger and, in fact, her own equipment, largely manned by her own crew, was the other substantial factor in the success of the operation.

The value of the portion of the cargo saved by the MESOLOGI is relevant, since plaintiffs had a direct hand in its transfer to their ship. Nonetheless, there was no evidence that defendants ever seriously considered jettisoning the cargo; and they rejected professional salvage services. Defendants' whole approach to the cargo transfer operation was that of a routine commercial matter, devoid of urgency and the dangers that support a salvage award of any sizeable amount.

In awarding three months wages to a salving crew, another trial judge mentioned criteria applicable here: "[t]he simplicity of the operation, its short duration, the relative ease of accomplishment, and the minimal risk to both the salved and the salving vessels all indicate an instance of low order salvage." Nicholas E. Vernicos Shipping Co. v. United States, 223 F.Supp. 116 (S.D.N.Y.1963), at p. 120. On appeal, that award was held excessive in light of the fact that the crew "received their agreed wages whether or not opportunity for salvage occurred and regardless of the results"; and the award was reduced by two-thirds to one month's wages. Nicholas E. Vernicos Shipping Co. v. United States, 349 F.2d 465, 472 (2d Cir. 1965).

Plaintiffs in this case originally demanded $5,000,000. as their award and, at the conclusion of the trial, suggested that an amount in excess of $700,000. would be appropriate. These sums are grotesquely disproportionate with reality, with the work done, the risk incurred and the actual benefits conferred by the plaintiffs upon the ship and cargo owners who are asked to pay them. It is certainly the policy of the maritime law to grant salvage awards that will encourage seamen to incur risk in going to the aid of vessels in distress; but it was never the policy of the law to allow a situation created by calamity to be converted into a windfall of unreasonable extravagance. In another context, extravagant fee claims were appropriately described in language pertinent herein. In Murphy v. N.A. Light & Power Co., 33 F.Supp. 567, 569 (S.D.N.Y.1940), Judge Woolsey wrote:

> The genesis of such exorbitant claims for fees can perhaps best be described, adopting the pungent language of the stock farm, as being by Cupidity out of Folly.

**641**

Indeed, I have never, during the thirty-nine years which covers my experience at the bar and on the bench, encountered a claim for fees so grotesquely out of line with the work done and the actual benefits conferred on the client who is asked to pay them.

█ The crew of the MESOLOGI, plaintiffs herein, are entitled to and the Court awards to each man a sum equal to 2 times his monthly wage based on rates of pay in effect during June of 1963. The shipowner and the cargo owner are each found to be responsible for one-half of the total amount awarded. Interest on all awards shall run from the date the decree is entered.

This opinion shall constitute the findings of fact and conclusions of law required by Rule 52(a), F.R.Civ.P.

A list of the names and addresses of the crew members of the MESOLOGI in June 1963 shall be filed with the decree. Submit decree within fifteen (15) days in accordance with the foregoing.

So ordered.